IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

JOHNNY DALE BLACK,            )
                             )
        Petitioner,           )
                             )
vs.                          )    Case No. CIV-02-225-C
                             )
RANDALL G. WORKMAN, Warden,   )
    Oklahoma State Penitentiary,  )
                             )
        Respondent.[1]        )

## MEMORANDUM OPINION

Petitioner, Johnny Dale Black, a state court prisoner, has filed a Petition for Writ of

Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 14. Petitioner, who is

represented by counsel, is challenging the Judgment and Sentence entered against him in

Stephens County District Court Case No. CF-99-01.[2] In that case, Petitioner was found

guilty by jury of Murder in the First Degree and Assault and Battery With a Dangerous

---

[1] When this action was commenced, Mike Mullin was the warden of the Oklahoma State Penitentiary and the properly named Respondent. However, Randall G. Workman is the current warden of the Oklahoma State Penitentiary and the state officer having present custody of Petitioner. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court finds that Mr. Workman should be substituted for Mr. Mullin as the proper party Respondent. See Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

[2] Petitioner's crimes occurred in Jefferson County, Oklahoma, and charges were filed there in two separate cases, Case Nos. CF-98-04 and CF-98-05 [O.R. (CF-98-04) 1-2; O.R. (CF-98-05) 1-2]. Upon the granting of Petitioner's motion for a change of venue, the cases were transferred for purposes of trial to the District Court of Stephens County and consolidated into a single case, Case No. CF-99-01 [O.R.(CF-99-01) 1, 35-38].

Weapon - Knife.  Petitioner received a sentence of death for his murder conviction and a consecutive 15-year sentence for his assault and battery conviction.

Respondent has responded to the Petition and Petitioner has replied.  Docs. 19 and 22.  In addition to his Petition, Petitioner has also filed a motion for discovery and a motion for an evidentiary hearing.  Docs. 15 and 18.  Respondent has responded to these motions as well.  Docs. 20 and 21.  The state court record has been provided.  Doc. 23.  Supplemental pleadings have also been filed by both parties relative to Petitioner's pursuit of state court relief subsequent to the filing of this action.  Docs. 32, 33, 36, and 37.  In consideration of the same, and for the reasons set forth below, the Court finds that Petitioner is not entitled to his requested relief.

## I.  Procedural History

After finding Petitioner guilty of both crimes, the jury determined Petitioner's sentences in a second stage proceeding.  In seeking the death penalty against Petitioner, the State alleged four aggravating circumstances, namely:  (1) Petitioner was previously convicted of a felony involving the use or threat of violence to the person; (2) Petitioner knowingly created a great risk of death to more than one person; (3) the murder was especially heinous, atrocious, or cruel; and (4) the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society [O.R. (CF-99-01) 41-43, 48-50].  At the conclusion of the second stage, the jury found all four aggravating circumstances and imposed a sentence of death for Petitioner's murder conviction.  The jury returned a 15-year sentence for his assault and battery conviction,

finding it to be after former conviction of a felony [O.R. (CF-99-01) 105-07]. On February 16, 1999, Petitioner was sentenced. The state trial court ordered that his sentences be served consecutively [O.R. (CF-99-01) 139-43; S. Tr. 13]. A Death Warrant was issued on February 18, 1999, and Petitioner's execution date was set for May 1, 1999 [O.R. (CF-99-01) 158-71].

In Case No. D-1999-249, Petitioner sought a direct appeal of his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). Upon application by Petitioner, the OCCA entered an order on March 9, 1999, staying Petitioner's execution date. The stay remains in effect. On March 12, 2001, the OCCA affirmed Petitioner's convictions and sentences in a published opinion, Black v. State, 2001 OK CR 5, 21 P.3d 1047. Rehearing was denied on April 9, 2001. Although Petitioner sought review of the OCCA's decision by the United States Supreme Court, his petition for writ of certiorari was denied on October 29, 2001. Black v. Oklahoma, 534 U.S. 1004 (2001).

On October 18, 2000, Petitioner filed his first application for post-conviction relief. In an unpublished opinion dated May 23, 2001, the OCCA denied Petitioner relief. The OCCA also denied Petitioner's requests for discovery and an evidentiary hearing. Black v. State, No. PC-2000-1073 (Okla. Crim. App. May 23, 2001) (unpublished).

On October 2, 2006, while the present action was pending, Petitioner returned to state court and filed a second application for post-conviction relief. On April 14, 2008, the OCCA once again denied Petitioner relief. Petitioner's additional request for an evidentiary hearing was also denied. Black v. State, No. PCD-2006-1059 (Okla. Crim. App. Apr. 14, 2008) (unpublished).

## II. Facts

In adjudicating Petitioner's direct appeal, the OCCA made a determination of the facts of the case. Pursuant to 28 U.S.C. § 2254(e)(1), these factual determinations are presumed correct unless Petitioner presents clear and convincing evidence rebutting the presumption. As Petitioner has offered no challenge to the OCCA's determination of the facts, the presumption stands. Thus, as set forth by the OCCA, the relevant facts of the case are as follows:

On January 4, 1998, Cal Shankles went to the trailer home of Jesse Black where Jesse, his brothers Jimmy Black and [Petitioner], Robert Seale and several others were watching football playoffs. A nervous Shankles wanted the Black brothers and Robert Seale to accompany him while he went to find his brother. Shankles told the Blacks and Seale that he needed them to watch his back because Justin Hightower was looking for him over an affair he had been having with Hightower's soon-to-be ex-wife. Thereafter, Shankles, the Black brothers and Robert Seale left the trailer in Shankles' mother's green Neon with [Petitioner] driving and Shankles on the lookout for Hightower's black Blazer.

Meanwhile, Bill Pogue and his son-in-law, Rick Lewis, drove to Ringling in Pogue's black Blazer to buy some chewing tobacco at a local convenience store. On their way back to Pogue's home, they passed the Neon at an intersection and one of its passengers yelled something at Pogue's Blazer. The Neon turned around and pulled in behind Pogue traveling at a high rate of speed and flashing its lights. Shortly thereafter, the Neon passed Pogue's Blazer and stopped in front of it. It was disputed at trial whether the Neon blocked the roadway.

According to Rick Lewis, the surviving victim, he and Pogue exited the Blazer. Lewis went around the back of the Blazer and came up behind Pogue. The four doors of the Neon opened and Jimmy Black, who was seated in the rear on the driver's side, got out and ran barreling towards them. In response, Pogue hit Jimmy Black in the face and the two began to wrestle towards and into the east bar ditch. Jesse Black and [Petitioner] then ran towards Lewis, who hit Jesse Black, momentarily knocking Jesse down. Lewis was able to

sidestep [Petitioner] and throw him into the front of the Blazer. [Petitioner] and Jesse Black then began fighting with Lewis in the west bar ditch. During the fight, Lewis looked up to see Cal Shankles with some type of club and felt a couple of blows to the head. Lewis did not remember seeing Shankles during the entirety of the fight and the evidence showed Shankles went from bar ditch to bar ditch alternately hitting Lewis and Pogue with some type of club. Lewis remembered seeing Robert Seale standing at the back of the Neon holding what looked like a tree branch, but never saw him fighting with anyone.

After several minutes of fighting, Lewis was able to break free and make his way to the east bar ditch where he saw Pogue on top of Jimmy Black and [Petitioner] over Pogue's back. Lewis pushed [Petitioner] off of Pogue and helped Pogue stand up and head toward the Blazer. Jesse Black then hit Lewis in the side of the head and said "that's for bustin' my lip." The Black brothers, Seale and Shankles then lined up behind the Neon yelling obscenities and taunting Lewis and Pogue. While Lewis assisted Pogue, who had been stabbed eleven times, into the Blazer, the Neon sped away. Although Lewis did not realize it during the fight, [Petitioner] had stabbed him thirteen times with wounds to the back of Lewis's head, spine, chest, side, buttock, leg and arm. After loading Pogue into the Blazer, Lewis raced him back to the Pogue barn, where family members took over and rushed both men to the Healdton hospital. Lewis was treated for his injuries and was later transferred to Ardmore for care. Pogue died at the Healdton hospital.

The morning after the fight [Petitioner] fled to Texas, where he was later apprehended and voluntarily confessed. Jesse and Jimmy Black, Robert Seale and Cal Shankles were also arrested and made voluntary statements. In [Petitioner's] voluntary statement to police, he claimed he did not go with Shankles to fight, but to see "what the deal was." He claimed he never intended to kill Pogue and he did not understand why Lewis and Pogue attacked his brothers. He maintained he did not remember stabbing Lewis and that he simply reacted because he was afraid for his brothers, Jesse and Jimmy. He claimed when he went to Jimmy's aid, he told Pogue to get off his brother or he would "stab" or "cut" him. When Pogue did not move, he stabbed him. According to [Petitioner], he and Pogue began to wrestle and roll around and Pogue kept rolling onto the knife. He maintained there was no intent to kill anyone and that his brothers did not know he used his knife.

Black, 2001 OK CR 5, ¶¶ 2-6, 21 P.3d at 1055-56 (footnotes omitted). Beyond this summary of the evidence, additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

## III. Analysis

**A.      Exhaustion as a Preliminary Consideration.**

The exhaustion doctrine is a matter of comity. It provides that before a federal court can seek to grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies. As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b).

In the present case, all but one of Petitioner's 15 grounds for relief have been presented to the OCCA. As Petitioner readily acknowledges, his Ground Fourteen has never been presented to the Oklahoma courts. Reply, p. 26. In his Ground Fourteen, Petitioner alleges that Oklahoma's sentencing scheme for death penalty cases violates the Sixth, Eighth, and Fourteenth Amendments. Petitioner's particular complaint is that the jury in his case was not required to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. In support of his claim, Petitioner cites Apprendi

v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002).[3]  Petition, pp. 101-02.

In light of the lack of exhaustion, Respondent has urged this Court to apply an anticipatory procedural bar.  Respondent argues that if Petitioner attempted to present the claim in a subsequent post-conviction application, it would be futile because the OCCA would apply a procedural bar to the claim due to Petitioner's failure to present it on direct appeal or in his first post-conviction application.  Response, pp. 79-82.  See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("'"Anticipatory procedural bar" occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.'") (quoting Moore v. Schoeman, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002)).  As noted above, Petitioner has already filed two post-conviction applications, the second of which came after the filing of the present case.  Thus, while Petitioner returned to state court to exhaust all of his other then-unexhausted grounds, he did not include his Ground Fourteen in his second post-conviction application.  If Petitioner returned to state court now, it would be his third application for post-conviction relief and there is no doubt that the OCCA would

_____

[3] In Schriro v. Summerlin, 542 U.S. 348, 358 (2004), the Supreme Court held that Ring does not apply retroactively to cases already final on direct review.  As Petitioner's case became final on October 29, 2001, when the Supreme Court denied certiorari review, Ring is inapplicable to his case.  See Beard v. Banks, 542 U.S. 406, 411 (2004) (a conviction is final "'for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied'") (quoting Caspari v. Bohlen, 510 U.S. 383, 390 (1994)).

procedurally bar the claim due to Petitioner's failure to raise it in an earlier application.[4] While Petitioner agrees that exhaustion is futile, he argues that because the OCCA has previously determined the issue, exhaustion is not required in accordance with Goodwin v. State of Oklahoma, 923 F.2d 156 (10th Cir. 1991). Reply, pp. 26-29.

Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Given the Tenth Circuit's recent decision in Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009), the Court finds that Petitioner's Ground Fourteen should be denied on the merits. See Smith v. Mullin, 379 F.3d 919, 927 (10th Cir. 2004) ("Where an issue 'may be more easily and succinctly affirmed on the merits,' judicial economy counsels in favor of such a disposition.'") (quoting Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004)). In Matthews, an Oklahoma capital habeas petitioner, relying on both Apprendi and Ring, argued that his jury should have been instructed to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Without this determination, Matthews argued his death sentence was invalid. Relying on its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007), the Tenth Circuit found no merit to the claim. In particular, the Court found that the jury's weighing of the factors in aggravation and mitigation "is not a finding of fact subject to Apprendi but

_____

[4] Apprendi was decided on June 26, 2000, during the pendency of Petitioner's direct appeal; however, briefing had been completed at that time. Petitioner's first post-conviction application was filed on October 18, 2000. Thus, Petitioner's initial post-conviction application provided the first opportunity for presentation of the claim. See 22 Okla. Stat. § 1089(C) & (D)(8) (Supp. 1995).

a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" Matthews, 577 F.3d at 1195 (quoting Barrett, 496 F.3d at 1107). In accordance with Matthews, Petitioner's Ground Fourteen is denied.

**B.      Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, __ U.S. __, 129 S.Ct. 1769, 1780 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

Whether a state-applied procedural bar is adequate and independent is a federal question. Id. at 736 ("federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds"). Generally, the matter of adequacy presents the tougher question. English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998). Whereas the issue of independence asks only whether the state court decision rested on state law, as opposed to federal law, the adequacy inquiry requires the habeas court to determine whether the applicable state procedural rule "is firmly established and regularly followed." Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008), *cert. denied*, __ U.S. __, 130 S.Ct.238 (2009). When making this

assessment, the focus is on the point of the purported default.  Spears v. Mullin, 343 F.3d 1215, 1251-52 (10th Cir. 2003); Clayton v. Gibson, 199 F.3d 1162, 1171 (10th Cir. 1999); Walker v. Att'y Gen., 167 F.3d 1339, 1344-45 (10th Cir. 1999).  See also Ford v. Georgia, 498 U.S. 411, 424 (1991) (assessing adequacy at "the time as of which it is to be applied").

In Spears, the Tenth Circuit acknowledged that assessing whether a state procedural-default rule is regularly and consistently applied requires a court to determine "'whether the [state] courts' actual application of the particular procedural default rule to all similar claims has been evenhanded in the vast majority of cases.'"  Spears, 343 F.3d at 1254 (quoting Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995)).  "[T]he fact that a state court has overlooked the procedural bar as an 'occasional act of grace' is insufficient to conclude that the procedural bar is inadequate."  Cannon v. Gibson, 259 F.3d 1253, 1268 (10th Cir. 2001) (citing Andrews v. Deland, 943 F.2d 1162, 1190 (10th Cir. 1991)).  See Beard v. Kindler, __ U.S. __, 130 S.Ct. 612 (2009) (concluding that even a discretionary state procedural rule can be adequate).

However, even if a court finds that the procedural bar is both adequate and independent, the court may proceed to the merits of a defaulted claim if a petitioner can satisfy an exception.  The first exception, cause and prejudice, requires a petitioner to demonstrate that some external objective factor, unattributable to him, prevented his compliance with the procedural rule in question.  Spears, 343 F.3d at 1255.  A petitioner must also show that the failure resulted in actual prejudice.  Thornburg v. Mullin, 422 F.3d 1113, 1141 (10th Cir. 2005).  The second exception can be met by showing that a

fundamental miscarriage of justice will occur if the claim is not heard. This requires a petitioner to make "a colorable showing of factual innocence." Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000). "In the specific context of a sentencing challenge, the Supreme Court has held actual innocence requires the petitioner to show 'by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law.'" Brecheen v. Reynolds, 41 F.3d 1343, 1357 (10th Cir. 1994) (quoting Sawyer v. Whitley, 505 U.S. 333, 348 (1992)).

In his Grounds One, Two, Three, Four, and Eleven, Petitioner raises claims which were presented to the OCCA for the first time in his second post-conviction application. In his Ground One, Petitioner asserts that his appellate counsel was ineffective. Petitioner faults his appellate counsel for failing to raise his Grounds Two and Three and for failing to raise additional claims regarding his trial counsel's ineffectiveness. Petitioner also makes a general allegation that his appellate counsel was ineffective to the extent any other claim alleged in his Petition was not properly preserved. In his Ground Two, Petitioner alleges that the state trial court erred in precluding his brother, Jimmy, from testifying in the second stage. In his Ground Three, Petitioner complains that the jury instructions were inappropriate as they foreclosed his "defense of brother" defense. In his Ground Four, Petitioner asserts that his trial counsel was ineffective. While two of the claims in Ground Four were presented on direct appeal and are hereinafter addressed on the merits, three of the claims were presented for the first time in his second post-conviction application. These claims include trial counsel's failure to discover and present evidence regarding Petitioner's organic brain

damage, failure to adequately pursue his "defense of brother" defense, and failure to object to victim impact/sympathy evidence introduced by the prosecution in the first stage. In his Ground Eleven, Petitioner claims that he was denied the right to an impartial jury because one of the jurors failed to disclose that he knew the deceased victim.

The OCCA refused to hear the merits of these claims. In particular, the OCCA held:

> Black makes no attempt to show that his claims are presented timely and meet the requirement that the factual or legal basis for the claim was unavailable before now. Instead, he argues that the interests of justice necessitate review of his claims by this Court. We disagree. All but two of Black's claims were capable of presentation in his direct appeal and original application for post-conviction relief. These claims are based neither on newly-discovered facts nor on new controlling legal authority, and are therefore barred.

Black, No. PCD-2006-1059, slip op. at 3. Regarding his Ground Eleven, the OCCA found that it was barred as well, but gave further explanation as to why.

> Black argues that he was denied a fair trial because one of the jurors in his case failed to reveal that he knew the victim. Black has not shown that evidence of the alleged juror misconduct was undiscoverable until now. He attaches an affidavit from an investigator with the Federal Public Defender's Office stating that he spoke with one of the jurors from Black's case, who revealed that he had conducted business with the victim prior to Black's trial and that this fact was not brought out at trial. There is nothing before us to show this information was not discoverable by direct appeal counsel or original post-conviction counsel through the exercise of reasonable diligence. Even if this information were not ascertainable until the investigator from the Federal Public Defender's Office discovered it, the investigator's affidavit is dated October 21, 2002. The factual basis for this claim was available for almost four years before this application was filed on October 2, 2006. This claim is barred.

Id. at 3-4.

As previously noted, when Petitioner originally filed his Petition, it included many unexhausted claims, including his Grounds One, Two, Three, Eleven, and a portion of his Ground Four. While Petitioner readily acknowledged the lack of exhaustion, he urged Respondent to waive exhaustion. He additionally argued that exhaustion was not futile. With particular reliance on Valdez v. State, 2002 OK CR 20, 46 P.3d 703, Petitioner asserted that the OCCA had utilized a miscarriage of justice exception to consider the merits of claims raised in a second post-conviction application. Thus, Petitioner argued that under Valdez, as well as some other unpublished OCCA cases, he had an available avenue to present his claims. If pressed to exhaust, Petitioner stated that he would do so; however, if the OCCA refused to hear the merits of his claims, he argued that its decision should not be respected by this Court. Again with reliance on Valdez and other OCCA cases, Petitioner asserted that the bar would be inadequate because, in light of its miscarriage of justice exception, the OCCA's application of a bar to claims presented in second post-conviction applications was inconsistent. Petitioner further asserted that application of the miscarriage of justice exception requires the OCCA to review the underlying merits of the claim. Petitioner also challenged the independence of the rule. Petition, pp. 7-11; Reply, pp. 1-6, 9, 12-13, 25.

In his response, Respondent did not waive exhaustion, but argued for the application of a procedural bar. Respondent asserted, however, that if this Court entertained doubts as to how the OCCA would adjudicate Petitioner's unexhausted claims, it should resolve the question by requiring exhaustion. Response, pp. 7, 14-15, 23, 27, 68-69.

Thereafter, Petitioner returned to state court to file a second post-conviction application. As noted above, the OCCA did not reach the merits of his new claims, but found them all to be procedurally barred. Supplemental briefing on the procedural bar issue was had. Both parties maintained their previously pleaded positions. Petitioner did, however, present additional OCCA published cases which he asserts strengthen his position. Docs. 32, 33, 36, and 37.

Based on the foregoing, the Court is required to make an initial determination as to whether the OCCA's adjudication of Petitioner's second post-conviction claims based upon a state procedural rule is both adequate and independent. For the following reasons, the Court concludes that it is.

First, and as noted above, when assessing whether the rule in question has been routinely and consistently applied, the time of default is the relevant time to be examined. Spears, 343 F.3d at 1251-52; Clayton, 199 F.3d at 1171; Walker, 167 F.3d at 1344-45. As the Tenth Circuit held in Walker, the reasoning behind this rule is that "[a] defendant cannot be expected to comply with a procedural rule that does not exist at the time, and should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has passed." Walker, 167 F.3d at 1345. While the present case presents a varying circumstance, namely the primarily subsequent development of an exception to the application of a state procedural rule, the focus remains the same: what was the existing law at the time of default? As the OCCA found, at the very latest, Petitioner's claims were all capable of presentation in his first post-conviction application which was filed October 18,

2000. Therefore, did Petitioner have reason to believe at that time that under existing Oklahoma law he was not required to discover, pursue and file all of his claims in his initial post-conviction application?

In support of his contention of inadequacy, Petitioner has cited six cases in which the OCCA has applied a miscarriage of justice exception to reach the merits of a claim presented in a post-conviction relief application, namely: Hawkins v. State, No. PC 96-1271 (Okla. Crim. App. Mar. 18, 1998) (unpublished); Clayton v. State, No. PCD-2000-1618 (Okla. Crim. App. Dec. 28, 2000) (unpublished); Valdez (issued May 1, 2002); Brown v. State, No. PCD-2002-781 (Okla. Crim. App. Aug. 22, 2002) (unpublished); Slaughter v. State, 2005 OK CR 6, 108 P.3d 1052; and Malicoat v. State, 2006 OK CR 25, 137 P.3d 1234.[5] However, the only one of these cases which was in existence at the time he filed his first post-conviction relief application was Hawkins. Thus, the question to be explored is whether Hawkins gave Petitioner reason to believe that claims not raised in his initial post-conviction application might thereafter be duly considered by the OCCA under the miscarriage of justice exception.

In Hawkins, a capital defendant raised a claim regarding his ineligibility for the death penalty. He asserted that the underlying felony used to support his first degree felony murder conviction was not one of the enumerated felonies which could be used to support a felony murder conviction. Although available, this claim was not raised on direct appeal. Under

---

[5] Petitioner has included copies of the unpublished dispositions in his Appendix.

its established post-conviction rules, the OCCA could not reach the merits of the claim.

Thus, the OCCA held as follows:

> If we were to end our analysis here, it would be with the tacit acknowledgment post-conviction review in this state is so narrow that the most egregious trial error can not be reached. We do not believe this approach would serve the state of Oklahoma well. Decisions of the Court are informed by a constant guiding principle: the Court has the inherent power to prevent a miscarriage of justice.

> In the context of post-conviction jurisprudence, a miscarriage of justice sufficient to avoid procedural default has been defined as the conviction of a person who is actually innocent, or the sentencing to death of a person who is not eligible for the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 346-47, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992). We adopt this standard for our analysis of post-conviction claims. Hawkins raises a colorable claim of ineligibility for the death sentence which we will address on the merits.

Hawkins, No. PC 96-1271, slip op. at 1-4.

While unpublished, Hawkins does set forth an exception to the application of a procedural bar to a claim which could have been raised on direct appeal. It is apparently the first time the OCCA applied the miscarriage of justice exception and it did so under a limited circumstance, namely, to address a claim of death ineligibility. Thus, when Petitioner filed his first post-conviction application, there was the established general rule that the only issues which could be considered in a post-conviction application were issues that were not and could not have been raised on direct appeal, and then there was the Hawkins exception. See 22 Okla. Stat. § 1089(C)(1) (Supp.1995); Cummings v. State, 1998 OK CR 60, 970 P.2d 188, 190; Richie v. State, 1998 OK CR 261, 957 P.2d 1192, 1195; Cannon v. State, 1997 OK CR 13, 933 P.2d 926, 928.

As a single unpublished case, Hawkins is insufficient to overcome any adequacy challenge to the rule in effect at the time Petitioner filed his direct appeal and first post-conviction application. At the time of Petitioner's default, there was little doubt that the OCCA required presentation of all available claims at the first available opportunity and that the failure to do so resulted in a waiver of those claims. Petitioner's claims were not raised on direct appeal or in his first post-conviction, but for the first time in a second post-conviction application filed almost six years after his original application.[6] In addition, Hawkins is distinguishable. Hawkins addressed a death ineligibility issue raised for the first time in an initial post-conviction application. Not only were Petitioner's defaulted claims not raised in his initial application, but they do not deal with death ineligibility or actual innocence.[7] Accordingly, Petitioner's reliance on Hawkins is unpersuasive.

Even if the Court were to look beyond Hawkins to the cases cited by Petitioner which were issued subsequent to his default, the result would be the same. But see Lambright v. Stewart, 241 F.3d 1201, 1203 n.2 (9th Cir. 2001) (cases decided after petitioner's appeal are not relevant in determining whether the state rule was well-established at the time of the

---

[6] While Oklahoma's requirement that trial counsel ineffectiveness claims be raised on direct appeal has been highly scrutinized, the Tenth Circuit has repeatedly recognized the application of a procedural bar to claims which could have been raised in an initial post-conviction application but were not. See Bland v. Sirmons, 459 F.3d 999, 1012 (10th Cir. 2006); Spears, 343 F.3d at 1254-55; Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000); Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999); Moore v. Reynolds, 153 F.3d 1086, 1096-97 (10th Cir. 1998).

[7] Although Hawkins concerned a death ineligibility claim, the miscarriage of justice exception set forth therein applies to claims of actual innocence as well. Petitioner, however, has never asserted his actual innocence. Petitioner readily admits that he killed Mr. Pogue.

default).  The Tenth Circuit's holding in Spears, 343 F.3d at 1254, bears directly on the issue. In Spears, the same challenge was made and similarly Spears cited Hawkins, Clayton, Valdez, and Brown in his challenge to the adequacy of the procedural bar.  Spears, 343 F.3d at 1254.  In Spears, the petitioner had presented several claims of trial counsel ineffectiveness for the first time in a second post-conviction application.  The OCCA refused to hear the claims because they had not been presented in his initial application.  Id. at 1253.  Giving due consideration to each case, the Court ultimately concluded that Valdez and Clayton were the only cases which were similarly analogous to Spears' second post-conviction application. Whereas Hawkins concerned a death eligibility issue presented in an initial application[8] and Brown concerned newly-discovered evidence, in both Valdez and Clayton, the OCCA had employed the miscarriage of justice exception to review the merits of a claim raised for the first time in a second application.  Nevertheless, the Court determined that these two cases, standing alone, were insufficient to overcome Oklahoma's regularly and consistently applied procedural bar to claims presented for the first time in a subsequent post-conviction application.  Id. at 1254-55.

In light of Spears, the Court finds that Petitioner's charge of inadequacy is also without merit, at least as it pertains to the four Oklahoma cases discussed therein.  The Court notes, however, that Petitioner has cited two additional OCCA cases, Slaughter and

---

[8] In Revilla v. Gibson, 283 F.3d 1203 (10th Cir. 2002), the Tenth Circuit acknowledged Hawkins and its application to death ineligibility claims.  Bypassing the procedural bar issue, the Court disposed of two death ineligibility claims on the merits.  Revilla, 283 F.3d at 1210-11 & n.3, 1214 & n.5.

Malicoat.[9]  After evaluating these cases as well, the Court finds they are not sufficiently analogous to Petitioner's case so as to invalidate the bar so applied.

Slaughter involved a third post-conviction application.  The OCCA acknowledged that Slaughter's claims were basically the same ones he raised in his second application; however, they centered around a "steadfastly maintain[ed]" claim of actual innocence.  Slaughter, 2005 OK CR 6, ¶ 5, 108 P.3d at 1053-54.  While the OCCA noted its continual belief that his allegations of innocence were unfounded, it held that its "rules and cases do not impede the raising of factual innocence claims *at any stage* of any appeal.  We fully recognize innocence claims are the Post-Conviction Procedure Act's foundation."  Id. at 200k OK CR 6, ¶ 6, 108 P.3d at 1054.  Thus, the OCCA reviewed the merits of Slaughter's actual innocence related claims.  Because Slaughter concerned actual innocence, which Petitioner has never alleged, it is not sufficiently analogous to Petitioner's case.

Malicoat is also distinguishable.  In response to the State's application for an execution date, Malicoat filed an objection.  In his objection, he claimed that Oklahoma's lethal objection protocol violated the Eighth Amendment.  In particular, Malicoat claimed "that the state's execution procedure creates a substantial risk that he will consciously suffer or experience excruciating pain during the execution process."  Malicoat, 2006 OK CR 25, ¶ 2, 137 P.3d at 1235.  The OCCA construed the objection as a subsequent post-conviction application.  While the state urged application of the waiver doctrine, the OCCA, noting that

_____

[9] Slaughter, decided in 2005, and Malicoat, decided in 2006, are both further removed from the time of default than Petitioner's other cited cases.

it had not yet had the opportunity to rule on this issue, declined to do so.  Citing <u>Valdez</u>, the

OCCA held as follows:

> If Malicoat's claim is correct, then his legal sentence will be carried out in an
> illegal manner, substantially violating both the United States and Oklahoma
> constitutions.  This Court has the authority to consider the merits of an issue
> which may so gravely offend a defendant's constitutional rights and constitute
> a miscarriage of justice.  In the interests of justice, and considering the
> importance of the principle of finality of sentences, we reach the merits of
> Malicoat's claim and deny his request to stay his execution date.

<u>Id.</u> at 200k OK CR 25, ¶ 3, 137 P.3d at 1235 & n.7 (footnote omitted).

Unlike Petitioner's claims, Malicoat's claim was not a routine attack on the validity

of his conviction or sentence, but focused on the manner in which his sentence would be

carried out.  The claim was one of first impression for the OCCA and its decision had

ramifications for all Oklahoma death row inmates.  Thus, like <u>Slaughter</u>, <u>Malicoat</u> is not

similarly analogous to Petitioner's case and does not support Petitioner's allegation of

inadequacy.

Having found the OCCA's bar to Petitioner's second post-conviction claims to be

adequate, the issue of independence must also be addressed.  It is Petitioner's contention that

in the OCCA's denial of his second post-conviction relief application, the OCCA relied upon

<u>Valdez</u> to deny relief.  The application of <u>Valdez</u> and its miscarriage of justice exception,

Petitioner asserts, requires the OCCA to "look to the underlying Constitutional right alleged

before deciding whether or not to reach the merits."  Thus, Petitioner concludes that the

OCCA's decision was dependent on federal law.  Doc. 37 at 9-10.

First, the OCCA's decision makes no reference to <u>Valdez</u> and contains no discussion of the miscarriage of justice exception. While Petitioner argued in his application that the OCCA employ <u>Valdez</u> to reach the merits of his claims, the OCCA declined to do so. The OCCA's treatment of the issue was simply, "We disagree." <u>Black</u>, No. PCD-2006-1059, slip op. at 3. This statement does not reflect any due consideration of the issue. Second, the OCCA's decision, as a whole, does not reflect any holding that is not based on state law. The OCCA referenced Petitioner's litigation history, cited its procedural rules and then applied them to Petitioner's claims. The OCCA found that its procedural rules prevented it from reaching the merits of Petitioner's claims, all of which were capable of being presented in his direct appeal and original post-conviction application. <u>Id.</u> at 1-4.

Even if the OCCA's "[w]e disagree" language is viewed as an application of its miscarriage of justice exception, it still does not show that federal law was involved in its determination. As the Supreme Court recognized in <u>Stewart v. Smith</u>, 536 U.S. 856 (2002), just because a state court looks to the merits of the claim does not mean that it decided the claim on the merits. A state court can look to the merits of a claim in order to identify the type of claim raised without incorporating federal law into its decision and running afoul of the independence rule. <u>Stewart</u>, 536 U.S. at 859-60. At most, the OCCA looked to the claims raised and found no reason to explore the application of a miscarriage of justice exception. By doing so, its decision did not lose its independence.

The Tenth Circuit's recent decision in <u>Gardner v. Galetka</u>, 568 F.3d 862 (10th Cir. 2009), *pet. for cert. filed*, No. 09-7870 (Nov. 25, 2009), is also instructive. While ultimately

resolving the issue on the merits, the Court noted that exceptions to a state's procedural bar would not automatically result in a finding of lack of independence. In particular, the Court stated:

> We do not think that a state's decision to allow exceptions to its procedural bar in the interest of preventing "fundamental unfairness," which requires an examination of the merits, makes the underlying bar any less procedural. If this were so, any procedural bar with an exception based on avoiding a fundamental miscarriage of justice would lose its character as an independent procedural ground under <u>Michigan v. Long</u>, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

<u>Gardner</u>, 568 F.3d at 884.

Based on the foregoing, the Court finds that the OCCA's application of a procedural bar to the claims presented in Petitioner's Grounds One, Two, Three, Four, and Eleven is both adequate and independent. Accordingly, it will be applied to preclude federal review unless Petitioner can establish cause and prejudice or a fundamental miscarriage of justice. Due to Petitioner's focus on the issue of adequacy and independence, Petitioner has devoted little argument to satisfying these exceptions. They will nevertheless be addressed.

As noted above, in his Ground One, Petitioner claims that his appellate counsel was ineffective. While Petitioner's first post-conviction application did contain some allegations of appellate counsel deficiency, it did not contain the allegations Petitioner now raises, and Petitioner has not shown why his current claims could not have been presented along with the other allegations contained therein. Thus, Petitioner has failed to make a showing of cause. Failing to demonstrate cause, the Court need not address the issue of prejudice as both

are required to satisfy the first exception. <u>Coleman</u>, 501 U.S. at 750 (meeting the first exception requires a showing of both cause and prejudice).

Petitioner fails to satisfy the second exception as well. Petitioner makes no attempt to demonstrate his actual innocence, and in fact admits in his Petition that "[t]here is no question [he] was responsible for stabbing Bill Pogue and Rick Lewis." Petition, p. 5. However, Petitioner does assert application of the <u>Sawyer</u>, 505 U.S. at ___, miscarriage of justice exception. With reference to his Ground Two, Petitioner claims that had his brother been allowed to testify in the second stage, the aggravation/mitigation scale would have been tipped in his favor. Petitioner asserts that the interplay of aggravating and mitigating circumstances is integral to death eligibility in Oklahoma and thus should be considered under <u>Sawyer</u>. Reply, pp. 10-11. The Court disagrees.

As the Supreme Court held in <u>Sawyer</u>, "the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." <u>Sawyer</u>, 505 U.S. at 347. In the present case, Petitioner was death eligible under Oklahoma law upon the jury's finding of at least one aggravating circumstance beyond a reasonable doubt. 21 Okla. Stat. § 701.11 (Supp.1987) ("Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed."). The jury found four. Thus, Petitioner's attempt to satisfy the <u>Sawyer</u> exception with reference to additional mitigation

evidence is unfounded.  See also Brecheen, 41 F.3d at 1357 (refusing to consider the presence or absence of particular mitigating circumstances under the Sawyer eligibility standard).

Regarding his Grounds Two, Three, Four, and Eleven, Petitioner has alleged ineffective assistance of appellate counsel as his cause.  However, given that his appellate counsel claim is also procedurally barred, Petitioner is precluded from using it as cause. Edwards v. Carpenter, 529 U.S. 446, 450-53 (2000); Spears, 343 F.3d at 1256.  Thus, Petitioner cannot satisfy the cause and prejudice exception for these claims either.  In addition, for the reasons set forth above, Petitioner has not shown that a miscarriage of justice will result if these claims are not heard.

Accordingly, the Court hereby finds that Petitioner's Grounds One, Two, Three, Eleven and a portion of his Ground Four are all procedurally barred from federal review. Relief as to these claims is therefore denied.

## C.    Merits.

In accordance with 28 U.S.C. § 2254(d), this Court's ability to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, this Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court acknowledged in Schiro v. Landrigan, 550 U.S. 465, 473 (2007), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."

The Supreme Court discussed the "contrary to or unreasonable application of standard" in Williams v. Taylor, 529 U.S. 362 (2000). The Court held as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13 (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II). Thus, to be contrary to, "[i]t is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." Gonzales v. Tafoya, 515 F.3d 1097, 1109 (10th Cir. 2008), cert. denied, __ U.S. __, 129 S.Ct. 211 (2008) (citing Williams). In addition, and with respect to the unreasonable application clause, "a petitioner is not entitled to relief merely because a federal court concluded in its independent judgment that the state court has applied federal law erroneously or incorrectly. Instead, the state court's application of federal law must be objectively unreasonable." Id. (citations omitted). See also Torres v. Mullin, 317 F.3d 1145, 1150-51, 1156 (10th Cir. 2003) (discussing Williams and concluding that

"[a]lthough a state court's reasoning does matter, ultimately, it is the reasonableness of the outcome that is paramount").

In Maynard v. Boone, 468 F.3d 665, 669-71 (10th Cir. 2006), the Tenth Circuit provided guidance as to what constitutes an unreasonable application. Agreeing that "considerable deference" should be afforded state court decisions, the Court held that "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." Maynard, 468 F.3d at 671. The Court determined that "a decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." Moreover, "[i]t is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision." Id. Citing the Seventh Circuit, the Court concluded that "the state court decision must be 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.'" Id. (quoting Badelle v. Correll, 452 F.3d 648, 655 (7th Cir. 2006)).

Just as § 2254(d)(1) gives great deference to a state court's legal determination, § 2254(d)(2) grants this same deference to its factual determinations. Evaluated in light of the evidence presented in the state court proceeding, the question is whether the state court decision is an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). While they are separate provisions, § 2254(d)(2) does interplay with § 2254(e)(1). Pursuant to § 2254(e)(1), a habeas court must presume the state court's factual findings to be correct unless a petitioner rebuts the presumption with clear and convincing evidence. House v.

Hatch, 527 F.3d 1010, 1019 (10th Cir. 2008), *cert. denied*, __ U.S. __, 129 S.Ct. 1345 (2009).  As noted by the Supreme Court in Miller-El v. Cockrell,

> [f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2) . . . .

Miller-El, 537 U.S. 322, 340 (2003).  Thus, to obtain relief under § 2254(d)(2), a "petitioner must demonstrate that a state court's finding . . . was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and the corresponding factual determination was 'objectively unreasonable' in light of the record before the court."  Id. at 348.

## 1. Ground Four:  Ineffective Assistance of Trial Counsel.

In his Ground Four, Petitioner raises two claims which were presented to the OCCA in his direct appeal.  Particularly, Petitioner alleges that his trial counsel was ineffective in the presentation of his manslaughter theory.  Petitioner additionally claims that his trial counsel was ineffective for failing to discover and present important facts about Mr. Pogue and the crime scene.  The OCCA addressed both of these claims on the merits and denied relief.  Black, 2001 OK CR 5, ¶¶ 64-69, 21 P.3d at 1070-72.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-prong test to determine ineffective assistance of counsel.  First, a petitioner must show that his counsel's performance was deficient to the point that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  An evaluation of counsel's performance under the first prong is based on whether

counsel's conduct, was reasonable under the facts. Id. at 690. When evaluating counsel's performance, a strong presumption exists that counsel's conduct was reasonable, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Second, a petitioner must show that counsel's errors and omissions resulted in actual prejudice to him. Id. at 687. In order to make a threshold showing of actual prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In denying Petitioner relief on his claims, the OCCA applied Strickland. Thus, in order to prevail before this Court on these claims, Petitioner must show that the OCCA's decision is contrary to or an unreasonable application of Strickland. For the following reasons, Petitioner has not satisfied this standard for relief.

Petitioner's first claim regarding the presentation of his manslaughter defense is two-fold. Petitioner's contention is that his trial counsel was ineffective for failing to either: (1) object to the burden imposed by the instruction defining adequate provocation, or (2) make argument consistent therewith. Ultimately, Petitioner asserts that his first stage defense was gutted by trial counsel's argument.

In finding that trial counsel was not ineffective with respect to the instructions given, the OCCA referred back to its resolution of the underlying claim. In his third proposition of

28

error, Petitioner alleged that the uniform instruction defining adequate provocation was erroneous based upon the "improper conduct" language employed therein. Finding that "the instruction's wording was appropriate and properly channeled the jury's decision making process," the OCCA denied relief on the claim. Thus, having determined that the jury was adequately instructed on heat of passion, the OCCA found that trial counsel was not ineffective for failing to request modified instructions. Black, 2001 OK CR 5, ¶¶ 66, 50-52, 21 P.3d at 1067-68, 1071. The holding of the OCCA on this point is consistent with Strickland. Trial counsel cannot be deemed ineffective for failing to raise a meritless claim.[10] Freeman v. Att'y Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) *cert. denied*, __ U.S. __, 129 S.Ct. 921 (2009). See Spears, 343 F.3d at 1249 (finding trial counsel was not deficient for failing to object to a flight instruction where the OCCA found sufficient evidence supporting the giving of the instruction).

As to the second half of this ineffectiveness claim, the OCCA concluded that Petitioner's trial counsel was not ineffective in closing argument. The OCCA noted that trial counsel "marshaled the evidence and vehemently argued [Petitioner] never intended to kill anyone and that the evidence supported heat of passion manslaughter." Black, 2001 OK CR 5, ¶ 67, 21 P.3d at 1071. The OCCA then held as follows:

> Although counsel did not characterize the victims' conduct as improper so as
> not to alienate the jury, she argued the conduct had to be taken into

---

[10] In his Ground Six, Petitioner directly attacks the adequate provocation instruction. The Court has found nothing unreasonable about the OCCA's resolution of this underlying claim. See Section III.C.3., infra.

consideration as to how [Petitioner] perceived it and reacted to it. She mindfully characterized the inconsistencies between Lewis's version of events and that of the defendants as nagging questions the jury must consider. This was a sound strategic decision that will not be second-guessed on appeal.

Id. Looking at the defense's closing argument, as well as the strategy pursued by trial counsel throughout trial, the Court concludes that the OCCA did not unreasonably deny relief.

Beginning in voir dire, and continuing through opening statement and closing argument, trial counsel readily and repeatedly admitted that Petitioner killed Bill Pogue (Tr. I, 112, 122, 125, 128, 134, 137, 205, 218; Tr. III, 757-58, 766, 771-73). However, laying the groundwork for a manslaughter conviction, trial counsel sought to portray the event as a tragedy brought forth by a series of unfortunate events. In opening statement, counsel noted that the event was instigated by another (Cal Shankles); it was dark; alcohol and marijuana were involved; it was a case of mistaken identity; the whole incident took only minutes; Petitioner was coming to the aid of his brothers; and the real problem: Petitioner took a knife to a fist fight (Tr. I, 205-20). Counsel stated in pertinent part, "This is the most incredible set of circumstances built on top of other circumstances . . . ," but "[i]t's not a Murder. It's a tragedy. One you can punish, one you can look at legally, but overall it's a tragedy" (Tr. I, 217, 220). Characterized in this manner, trial counsel acknowledged that she was "not suggesting any ill will on anybody's part" (Tr. I, 220). In sum, the circumstances did not support a finding of premeditated murder, but that Petitioner was defending his brothers in the heat of passion (Tr. I, 217-18).

In closing, trial counsel continued with the theme of tragedy and unfortunate circumstances (Tr. III, 757, 760-62, 764-68). In this context, trial counsel did repeatedly state that the victims were not at fault and did nothing wrong (Tr. III, 747, 750, 752, 760, 767). When considered in light of the definition of adequate provocation given the jury, it is with this line of argument that Petitioner faults his counsel. By stating that the victims did not act improperly, Petitioner asserts that his trial counsel admitted a lack of provocation and thereby negated his heat of passion defense.

While viewing the comments in isolation would tend to lend support to Petitioner's claim, it goes without saying that counsel's effectiveness, or lack thereof, in closing argument cannot be judged without reference to the whole argument and consideration of the strategy pursued throughout trial. See Smith v. Gibson, 197 F.3d 454, 461 (10th Cir. 1999) (considering the entirety of defense counsel's argument in assessing whether he rendered deficient performance in closing). Consistent with Petitioner's statement to police, trial counsel laid all the cards on the table for the jury, admitting that Petitioner killed Mr. Pogue but arguing that he did so under unfortunate but explainable circumstances which did not equate to first degree murder. While counsel sought to excuse and/or explain Petitioner's conduct, counsel was careful not to assess blame on the victims. Counsel was well-aware that Mr. Pogue and his family were very well-known and beloved members of the

community [O.R. (CF-98-04) 262, 265; P.H. Tr. II, 474-75; M. Tr. 10, 15]. Accordingly, counsel avoided any direct attacks and/or disparaging remarks against the victims.[11]

However, while making direct statements that the victims did nothing wrong, trial counsel also questioned the victims' actions, arguing in an indirect manner that they did act improperly. In both opening statement and closing argument, counsel questioned why the victims did not let Petitioner pass, why they stopped instead of turning around or driving by, why they got out of the Blazer, why no words were spoken and why they threw the first punches (Tr. I, 214-16; Tr. III, 750-51, 753, 768-72). Just as the prosecutor picked up on the argument characterizing it as "we're not blaming them, but . . . ," the jury was likewise aware of the argument being made (Tr. III, 777, 795-96).

Therefore, contrary to Petitioner's assertions and as the OCCA found, it is clear that trial counsel did effectively advocate for Petitioner's defense in closing argument. While being respectful to the victims, counsel strongly attacked the intent element needed to support a first degree murder conviction and played up the tragic circumstances supporting a heat of passion manslaughter conviction (Tr. III, 771-73). The OCCA's determination that this was sound trial strategy is not unreasonable.

Petitioner's additional ineffective assistance of counsel claim concerns his trial counsel's failure to investigate and present certain evidence. First, Petitioner faults his

---

[11] Trial counsel went even further by acknowledging the overall goodness of the victims. Twice during the examination of witnesses, trial counsel acknowledged that Mr. Pogue was a great man (Tr. II, 317, 579). Trial counsel made additional such statements in closing argument (Tr. III, 746, 762, 767).

counsel for failing to present evidence to refute testimony received about Mr. Pogue's bad health. Petitioner asserts, as he did on direct appeal, that his trial counsel should have presented evidence to show that Mr. Pogue "was a far more vigorous man than he was portrayed at trial." Petitioner asserts that such evidence was relevant to show that the fight between Mr. Pogue and his brother, Jimmy, was more equal and that the potential harm to Jimmy greater than what was shown at trial. Petition, p. 56. In support of this claim, Petitioner relies upon 1996 documents from a worker's compensation case involving Mr. Pogue. While these documents show that in June of 1996, Mr. Pogue was awarded worker's compensation benefits, having "sustained 39.5 percent permanent partial disability to the BODY AS A WHOLE due to injury for aggravation of ASHMA [sic] and PULMONARY OBSTRUCTIVE DISEASE," Petitioner, with references to evaluations done in the preceding February, notes Mr. Pogue's failure to put forth a best effort. With reference to a request to review the order awarding the benefits, Petitioner also notes that Mr. Pogue was not too disabled to compete in two rodeo events in 1996. See Exhibits A, B, C, D, Q and R, Application for Evidentiary Hearing on Sixth Amendment Claims, Case No. D-1999-249 (Jan. 3, 2000).

At trial, Mr. Lewis testified on direct examination that his father-in-law, Mr. Pogue, had lost a lot of lung capacity, had trouble breathing, had bad knees and could hardly walk (Tr. I, 224, 229). Mr. Pogue's son, Charles, gave similar testimony (Tr. II, 566). The prosecution made reference to this evidence in both opening statement and closing argument

(Tr. I, 195, 197; Tr. III, 793). It was established that Mr. Pogue was 54 years old. He was 5'11" and weighed 185 pounds (Tr. II, 333; State's Exhibit 20).

In response to this evidence, trial counsel questioned how Mr. Pogue was nevertheless able to overcome Jimmy, a man almost half his age and greater in size (Tr. II, 310-13, 582). In addition, through the testimony of Jimmy, evidence was brought forth that Jimmy was 30 years old at the time of trial, was 6'1" and weighed 205 pounds at the time of the altercation. Explaining the altercation in detail, Jimmy described Mr. Pogue as a strong and dominant opponent (Tr. III, 673-79, 715). Finally, in closing argument, trial counsel argued that Mr. Pogue was not as feeble as he was made out to be. As trial counsel stated,

> He may not have been as strong as he used to be, and he might not have been able to do it for very long, but for the short time this fight happened, he was strong. Because you saw how big Jimmy was, and this man had the power to hold him down against his will, hold him down.

(Tr. III, 751-52). In response, the prosecution acknowledged, "[W]e're not trying to mislead you. Mr. Pogue did have some serious health problems, oxygen, but I'm sure he did put up a good struggle for a minute" (Tr. III, 793).

In adjudicating this claim, the OCCA considered the proffered evidence and denied relief. Black, 2001 OK CR 5, ¶¶ 50-51, 21 P.3d at 1071. See Wilson v. Workman, 577 F.3d 1284, 1292 (10th Cir. 2009) (deference is due OCCA decisions which analyze the proffered non-record evidence to determine whether counsel's failure to investigate entitles a defendant to relief under Strickland). The OCCA then found as follows:

> The record before this Court shows counsel mounted a well-reasoned defense to the first degree murder charge arguing [Petitioner] stabbed the

victims because he feared for the safety of his brothers during a fight and that [Petitioner] never intended to kill anyone. The medical records supplied by appellate counsel are from exams one and half years before the incident. These records show that Pogue had asthma and did little because he was clinically depressed. Instead of introducing this type of evidence to show Pogue was not feeble and in poor health such that he would not consider initiating a fight, counsel chose to focus on the fact that 54 year old Pogue got out of his vehicle, threw the first punch and was able to hold down and contain Jimmy Black, a 6'2", 230 lbs. 25-year-old, during the fight . . . . Given the record before this Court, we find this claim is without merit and that an evidentiary hearing is not warranted because the application and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was deficient for failing to utilize the complained-of evidence.

Black, 2001 OK CR 5, ¶ 69, 21 P.3d at 1071.[12]

The OCCA's decision is consistent with Strickland. As Strickland holds, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. While Petitioner argues that his trial counsel did not have this evidence and did not investigate this area at all, there is no support for this assertion. While Petitioner has submitted an affidavit from his trial counsel, trial counsel makes no assertions therein regarding this claim. What is known is that this evidence was not introduced at trial. The question is therefore whether the absence of the same was both deficient and prejudicial to Petitioner. It was not. As the

---

[12] As noted above, the evidence showed that at the time of the altercation, Jimmy was a 6'1", 205-lb. 29-year-old. This discrepancy in the OCCA's opinion does not diminish its ultimate conclusion.

OCCA found, and as detailed above, trial counsel effectively challenged Mr. Pogue's health at trial. In addition, the worker's compensation evidence presented by Petitioner would have added little or no support, and in fact may have been more harmful than beneficial. While the evidence could have been used to show that Mr. Pogue was seeking worker's compensation benefits while participating in rodeo competitions, the same evidence would also show that a judge determined that Mr. Pogue was entitled to $36,537.50 in benefits due to a 39.5 percent disability from asthma and pulmonary disease. Providing documentation of Mr. Pogue's physical condition could have, in fact, bolstered the testimony given regarding Mr. Pogue's health issues, fostered questions as to the actual danger posed to Jimmy, and lent support to a finding that Jimmy was the overwhelmingly favored opponent in the altercation. Under these circumstances, and as found by the OCCA, trial counsel was not ineffective for not introducing this evidence.

Petitioner's second failure to investigate claim concerns trial counsel's failure to present evidence regarding the roadway where the altercation occurred. On direct appeal, Petitioner proffered evidence that Mr. Pogue had sufficient room to navigate around the car driven by Petitioner, and thus had the ability to avoid the altercation altogether. See Exhibits E through P, S, and T, Application for Evidentiary Hearing on Sixth Amendment Claims, Case No. D-1999-249 (Jan. 3, 2000). Petitioner's contention is that this evidence would have supported his argument that Mr. Pogue elected to enter into the confrontation. Petition, p. 58.

A disputed issue at trial was whether Petitioner blocked the roadway when he stopped in front of Mr. Pogue's Blazer. <u>Black</u>, 2001 OK CR 5, ¶ 3, 21 P.3d at 1055. On direct examination, Mr. Lewis testified that the car stopped in front of them and across both lanes. Mr. Lewis described the roadway as having deep ditches on both sides and no shoulders. Although Mr. Lewis acknowledged that Mr. Pogue could have backed away, he testified that there was no way to drive around the car (Tr. I, 237-41; State's Exhibits 2 and 3). On cross-examination, however, Mr. Lewis acknowledged that the road was 19 feet wide, that there was about two feet of level area on each side before it sloped down, that the Neon driven by Petitioner was a small car, that Mr. Pogue was familiar with the area, and that it was "probably possible . . . but very unlikely" that Mr. Pogue could have driven his Blazer around (Tr. I, 297-300; Defendant's Exhibit 1).[13] On cross-examination, Mr. Lewis also acknowledged that while Mr. Pogue was forced by Petitioner to stop, they did not, at least initially, feel the need to defend themselves and neither he nor Mr. Pogue were forced to get out of the Blazer (Tr. II, 305, 320).

In contrast to Mr. Lewis's testimony, Jimmy Black testified that Petitioner stopped directly in front of the Blazer and did not block the road (Tr. III, 672, 689-90). Additional drawings of the scene supporting his testimony were also admitted into evidence. One, State's Exhibit 12, was drawn by Petitioner. It shows the Neon directly in front of the Blazer

---

[13] Charles Pogue also gave testimony about the roadway. He testified that if the area was not wet, it was possible to drive off the roadway and go around. However, according to him, the ground was wet that night (Tr. II, 567-68, 580-81).

(Tr. II, 444; State's Exhibit 12). Two others, Defendant's Exhibits 4 and 5, were drawn by Sheriff's Deputy Martin Matney. While one drawing shows the Neon in a slanted position, in neither drawing is the Neon blocking the other lane (Tr. II, 469-70). Deputy Matney testified that Defendant's Exhibit 4 was based on Robert Seale's statement (Tr. II, 471-72).[14] Deputy Matney further testified that if the Neon was in the other lane at all, the Blazer would have had to leave the roadway to go around it but probably could have done so (Tr. II, 477).

The OCCA reviewed the evidence proffered by Petitioner and found that the evidence did not entitle him to relief or an evidentiary hearing. Black, 2001 OK CR 5, ¶¶ 50-51, 21 P.3d at 1071-72. The OCCA noted, as detailed above, that trial counsel did question witnesses about the ability of the Blazer to go around the Neon. The matter was thus addressed and counsel was not ineffective for going no further.

> Because Pogue was a well-known, valued member of the community, counsel was careful not to demonize Pogue by arguing he was the aggressor who purposefully stopped his Blazer to teach these people a lesson for honking at him rather than going on by or that Pogue somehow had a duty to go around them.

Id. at 2001 OK CR 5, ¶ 69, 21 P.3d at 1071-72.

The decision of the OCCA is not unreasonable. As detailed above, trial counsel did question the witnesses and bring forth evidence which supported a finding that the Blazer

---

[14] Mr. Seale's taped statement was played for the jury and a transcript of the tape was provided to them (Tr. II, 499; Tr. III, 724-25; Defendant's Exhibits 8 and 8A). While Defendant's Exhibit 8A is missing from the state court record provided to the Court, a transcript of Mr. Seale's statement was admitted at preliminary hearing as Defendant Seale's Exhibit #1. On page 10 of his statement, Mr. Seale states that Petitioner did not block the road when they passed the Blazer and stopped.

could have gone around the Neon. Although the position of the Neon was disputed, the jury was advised, through testimony and admitted exhibits, regarding the type of vehicles involved, the width of the roadway, and the distance between the crime scene and the bridge guardrails. In closing argument, trial counsel asked the jury to pay close attention to the maps drawn by Deputy Matney and argued that there was clearly room for the Blazer to go around (Tr. III, 772). Under these circumstances, the OCCA's decision that trial counsel was not ineffective for taking the matter no further is reasonable and entitled to deference.

In summary, for the reasons set forth above, the Court finds that Petitioner has failed to show that the decision of the OCCA denying him relief upon his claims of trial counsel ineffectiveness is contrary to, or an unreasonable application of, Supreme Court law. Accordingly, Petitioner's Ground Four fails.

### 2. Ground Five: Heat of Passion Manslaughter Instructions.

In his Ground Five, Petitioner alleges that the heat of passion manslaughter instructions given in his case were deficient. Relying on the Supreme Court's holding in Mullaney v. Wilbur, 421 U.S. 684 (1975), as interpreted and applied by the Tenth Circuit in United States v. Lofton, 776 F.2d 918 (10th Cir. 1985), Petitioner asserts that the jury should have been instructed that heat of passion manslaughter was his defense, that the State had the burden of disproving heat of passion beyond a reasonable doubt, and that it should simultaneously consider the murder charge along with the lesser heat of passion charge. Petitioner raised this claim on direct appeal. Finding that "the instructions administered in this case were constitutionally adequate to ensure that the appropriate burdens of proof were

allocated to the parties and that the jury was free to consider [Petitioner's] defense," the OCCA denied relief. Black, 2001 OK CR 5, ¶ 49, 21 P.3d at 1067.

The instructions given in the present case were the uniform instructions and Petitioner made no objection to them at trial.[15] Black, 2001 OK CR 5, ¶¶ 42, 48, 21 P.3d at 1064-65, 1066. The jury was instructed that the State had the burden of presenting evidence of Petitioner's guilt and that he "must be found not guilty unless the State produces evidence which convinces you beyond a reasonable doubt of each element of the crime" [O.R. (CF-99-01) 76]. The State's burden of proof beyond a reasonable doubt was reinforced in the elements instruction which further advised the jury that malice aforethought was an element of murder in the first degree [O.R. (CF-99-01) 78]. Malice aforethought was defined for the jury as "a deliberate intention to take away the life of a human being" [O.R. (CF-99-01) 79].

The jury was also advised that in addition to evidence regarding the charged crime, evidence regarding the lesser crime of manslaughter in the first degree had also been introduced. The elements of heat of passion manslaughter were set forth and the jury was advised that "[i]f you have a reasonable doubt of [Petitioner's] guilt of the charge of murder in the first degree, you must then consider the charge of manslaughter in the first degree" [O.R. (CF-99-01) 80]. Regarding the passion or emotion required for heat of passion, the

---

[15] In fact, trial counsel specifically requested the instructions given (Tr. III, 723) ("For the record the Defense did in fact prepare their own Instructions, but this is a first, I think, in OIDS history, certainly by my history, the Judge has offered all of those, and so I'm not filing them because the court is offering all of the suggested Instructions by the Defense.").

jury was instructed that it "must have existed to such a degree as would naturally affect the ability to reason and render the mind incapable of cool reflection" [O.R. (CF-99-01) 83]. The jury was additionally instructed that if it had reasonable doubt as to which offense Petitioner committed, it could only find him guilty of the lesser offense [O.R. (CF-99-01) 85].

In Mullaney, 421 U.S. 684, the Supreme Court addressed a Maine homicide statutory scheme which provided that all intentional or criminally reckless killings were punished as murder "unless the defendant proves by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation, in which case it is punished as manslaughter . . . ." Mullaney, id. at 691-92. In that case, the jury had been instructed that "if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied" unless the defendant met the foregoing burden of proof. Id. at 686. Thus, the question presented was whether the burden of proof placed upon the defendant comported with due process. Id. at 692. The Supreme Court found that it did not. In particular, the Supreme Court held "that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." Id. at 704.

Despite the broad language of the Mullaney, the Supreme Court specifically limited the holding just two years later in Patterson v. New York, 432 U.S. 197 (1977). In Patterson, the Supreme Court examined New York law and the due process implications where a defendant was required to prove an affirmative defense of extreme emotional disturbance by

a preponderance of the evidence in order to reduce his murder charge to manslaughter.

Patterson, 432 U.S. at 198-200.  Finding no due process violation, the Supreme Court held as follows:

> We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused.  Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch.  We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.  *Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here.*

Id. at 210 (emphasis added).  To the extent this holding contradicted Mullaney, the Supreme Court held that Mullaney "should not be so broadly read."  Id. at 215.  As the Patterson Court found, Mullaney does nothing more than hold the prosecution to its burden of proof, while prohibiting any burden shifting of essential elements of the offense.  "Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.  *It was unnecessary to go further in Mullaney.*"  Id. (emphasis added).

In Lofton, 776 F.2d 918, the Tenth Circuit applied Mullaney and held that "a defendant in a federal murder case who has sufficiently raised a heat of passion defense is entitled to instructions informing the jury of the theory of defense and of the Government's duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a

murder conviction." Id. at 920. With respect to Patterson, the Lofton Court found that the Supreme Court "did not retreat from its holding in Mullaney . . . ." Id.

While Petitioner's claim for relief arises from Lofton, Lofton is not controlling in the present case. As recognized by the Tenth Circuit in Bland, in order for Petitioner to obtain habeas relief from his state convictions, he must show that the decision of the OCCA is "'contrary to or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States.*'" Bland, 459 F.3d at 1014 (quoting 28 U.S.C. § 2254(d)(1)). As Bland acknowledges, there is no consensus among the lower federal courts as to the proper scope of Mullaney and Patterson, but, in any event, the holdings of these lower federal courts are not determinative of the issue. Id.

In Bland, the Tenth Circuit found no merit to a habeas petitioner's claim for relief under Mullaney, as limited by Patterson, "[b]ecause the written instructions did not permit the jury to presume malice aforethought, required the State to prove malice aforethought beyond a reasonable doubt, and defined malice and heat of passion as mutually exclusive . . . ." Id. at 1013. Despite Lofton's interpretation of Mullaney and Patterson, the Court additionally found that "[b]ecause the OCCA's decision reasonably applies the correct legal rule from Mullaney, as the Supreme Court construed that rule in Patterson, the OCCA decision is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent . . . ." Id. at 1014.

The present case is like Bland. As shown above, the instructions given required the State to prove Petitioner's guilt beyond a reasonable doubt, imposed no presumption of

malice or any other essential element, and defined malice and heat of passion as mutually exclusive. There is no doubt that the jury in the present case knew that Petitioner was defending the murder charge by claiming heat of passion. Petitioner readily admitted that he killed Mr. Pogue. The central issue, however, was whether he did so intentionally with malice aforethought or out of fear in a heat of passion. See Black, 2001 OK CR 5, ¶ 43 & n.14, 21 P.3d at 1065 & n.14. Thus, the jury's determination of whether the State had met its burden of proof with respect to intent necessarily included an evaluation of Petitioner's state of mind and asserted defense that he acted in fear for the safety of his brothers and not with any intent to kill. Under these circumstances, the OCCA's determination that the instructions were constitutionally adequate is not contrary to, or an unreasonable application of, Mullaney and Patterson. Accordingly, relief is denied as to Petitioner's Ground Five.

**3. Ground Six: Adequate Provocation Instruction and Insufficient Evidence.**

In his Ground Six, Petitioner raises two claims. First, Petitioner complains about the jury instruction defining adequate provocation. Second, Petitioner argues a lack of sufficient evidence to support his first degree murder conviction. Petitioner raised both of these claims on direct appeal. The OCCA denied relief. Black, 2001 OK CR 5, ¶ 33-38, 50-53, 21 P.3d at 1062-64, 1067-68.

As set forth in the OCCA's opinion, the uniform instruction given defined "adequate provocation" as follows:

"any *improper conduct of the deceased* toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion

44

within a reasonable person in the position of the defendant. Generally, actions which are calculated to provoke an emotional response and ordinarily cause serious violence are recognized as adequate provocation. Actions that do not ordinarily provoke serious violence do not constitute adequate provocation. In determining whether the deceased's conduct was adequate provocation, the conduct is judged as a person of reasonable intelligence and disposition would respond to it. Mere words alone, or threats, menaces, or gestures alone, however offensive or insulting, do not constitute adequate provocation. However, words, threats, menaces, or gestures, when considered in connection with provoking conduct of the deceased, may constitute adequate provocation. Personal violence or aggression by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant may be adequate provocation."

Black, 2001 OK CR 5, ¶ 51, 21 P.3d at 1067. Petitioner's complaint with the instruction is its alleged failure to address a mutual combat situation. While relying on evidence that the victims threw the first punches, Petitioner nevertheless asserts that the "improper conduct" language employed in the instruction prevented the jury finding him guilty of the lesser offense of heat of passion manslaughter.

To obtain relief for this alleged error, Petitioner "must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny [him] due process." Tiger v. Workman, 445 F.3d 1265, 1267 (10th Cir. 2006). See Estelle v. McGuire, 502 U.S. 62, 72 (1991); Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). Because the OCCA entertained the merits of this claim, deference is due its conclusion that "the instruction's wording was appropriate and properly channeled the jury's decision making process . . . ." Black, 2001 OK CR 5, ¶ 53, 21 P.3d at 1068.

In denying Petitioner relief on the claim, the OCCA found that even if it accepted Petitioner's arguments that the instruction was deficient, Petitioner would still not be entitled

45

to relief. The uncontroverted evidence was that the victims threw the first punches. Id. 2001 OK CR 5, ¶ 4, 21 P.3d at 1055. The OCCA noted that this evidence supported two possible scenarios. One, Petitioner's brothers approached the victims in a non-threatening manner but were unjustly attacked, or two, Petitioner's brothers approached in a threatening manner, to which the victims defensively responded. If the jury believed the first scenario, then it could have found that the victims acted improperly and that adequate provocation existed. The OCCA additionally found that the instruction was not defective for failing to state that mutual combat may constitute adequate provocation. Because "the jury was presented with two versions of how the altercation began[,] [t]he instruction administered correctly required the jury to determine if [Petitioner] was adequately provoked based on the facts presented." Id. 2001 OK CR 5, ¶ 55, 21 P.3d at 1068.

The Court finds that the OCCA's resolution of this issue is not unreasonable. While claiming that the instruction did not address the mutual combat situation at hand, Petitioner relies on the very evidence that the OCCA considered, namely, that the victims struck the first blows. The victims having attacked his brothers, Petitioner's claim is that he responded out of fear for his brothers' safety. In light of this evidence, it is clear that the jury could have found that the victims acted improperly and that the victims' actions provoked Petitioner's response. Petitioner's characterization of the altercation as mutual combat does not alter this conclusion. Mutual combat, where two parties willingly engage in a fight, is simply one of the circumstances in which provocation can be found to exist. WAYNE R.

LaFave, Substantive Criminal Law § 15.2 (2nd ed. Supp. 2009). Nothing in the given instruction prevented the jury from finding provocation under such circumstance.[16]

Beyond Petitioner's complaint with the instruction, Petitioner additionally asserts that his conviction is not supported by constitutionally sufficient evidence. In denying relief on his claim, the OCCA "view[ed] the trial evidence in the light most favorable to the State and ask[ed] whether a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." Black, 2001 OK CR 5, ¶ 34, 21 P.3d at 1062 (citing Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04). The OCCA's standard of review mirrors the Supreme Court standard. See Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). The Jackson standard "is based on our system's longstanding principle that it is the province of the jury to evaluate the evidence and to draw reasonable inferences from trial testimony." Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir.

---

[16]While focus has been placed on the "improper conduct" language of the instruction, additional language contained therein is relevant. See Cupp, 414 U.S. at 146-47 ("we accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"). The instruction further advised that "'[g]enerally, actions which are calculated to provoke an emotional response and ordinarily cause serious violence are recognized as adequate provocation. Actions that do not ordinarily provoke serious violence do not constitute adequate provocation.'" Black, 2001 OK CR 5, ¶ 51, 21 P.3d at 1067. Thus, regardless of their nature, some actions constitute adequate provocation and others do not. Irrespective of the initial reference to improper conduct, the import of the instruction as a whole is that the deceased must have done something to provoke the violence. See id. ("'In determining whether the deceased's conduct was adequate provocation, the conduct is judged as a person of reasonable intelligence and disposition would respond to it.'").

2005). Review, therefore, is "'sharply limited'" and a reviewing court "must accept the jury's determination as long as it is within the bounds of reason." Id.

A sufficiency of the evidence claim presents a mixed question of law and fact. Thus, both sections of 28 U.S.C. § 2254 are implicated. Moreover, pursuant to 28 U.S.C. § 2254(e), the OCCA's determination of the facts is presumed correct. Brown v. Sirmons, 515 F.3d 1072, 1089 (10th Cir. 2008), *cert. denied*, __ U.S. __, 129 S.Ct. 403 (2008)..

In denying Petitioner relief on his claim, the OCCA particularly found that "the trial evidence was sufficient to disprove heat of passion manslaughter beyond a reasonable doubt and allow a rational trier of fact to find [Petitioner] was neither adequately provoked nor acting in a heat of passion sufficient to negate malice." Black, 2001 OK CR 5, ¶ 41, 21 P.3d at 1064. In reaching this conclusion, the OCCA relied upon the following determined facts:

> Contrary to [Petitioner's] assertion, the direct and circumstantial evidence presented at trial was sufficient for a rational trier of fact to conclude [Petitioner] intended to kill Bill Pogue when he stabbed him eleven times, his statements notwithstanding. The evidence showed Cal Shankles arrived at Jesse Black's trailer where he had a private back-room conversation with [Petitioner] and his brothers presumably advising them of his current difficulties with Justin Hightower. Shankles and the Blacks left shortly thereafter for approximately 15 to 20 minutes and returned for another private back-room discussion. Thereafter, they and Seales [sic] left in search of Justin Hightower where a fight of some kind was likely and anticipated as the evidence showed Shankles had been looking for others to help him fight Hightower as well as for weapons to use in such fight. [Petitioner] voluntarily accompanied Shankles to the arranged confrontation armed with his knife.

> When the defendants encountered the victims who Shankles wrongly identified as the men looking for him, [Petitioner] intentionally followed Pogue's Blazer. Even though [Petitioner] claimed that it appeared the two victims kept reaching down like they were loading guns, [Petitioner] chose to pull in front of the Blazer and force it to stop, rather than avoid a fight with

armed men. Knowing about fighting and guns, [Petitioner] said he knew someone was going to get hurt. Without pause after the cars stopped, Jimmy and Jesse Black jumped out and rushed Lewis and Pogue in a threatening manner demonstrating a group intent to, at the very least, fight the Blazer occupants. [Petitioner] immediately followed Jesse and joined in a fight with Lewis where [Petitioner] quickly pulled out his knife stabbing Lewis thirteen times with wounds to the head and chest. Although [Petitioner] claimed he acted out of fear for his and Jesse's safety, the evidence showed Lewis was fighting with three men at the time [Petitioner] stabbed him. Given this ratio, a jury could disbelieve [Petitioner's] statement that he acted out of fear.

Although [Petitioner] claimed he then went to Jimmy's aid, his account of his encounter with Pogue was contradicted by his brother Jimmy. [Petitioner] claimed Pogue failed to respond to his warning to let Jimmy go or be stabbed. [Petitioner] said he and Pogue "locked up" rolling on the ground while Shankles hit Pogue with the club. [Petitioner] claimed Pogue kept rolling onto the knife and refused to let go until someone said, "let him go or we're going to kill you." Jimmy, on the other hand, testified Pogue was holding him down when [Petitioner] stood over Pogue's shoulder. Jimmy further testified he never saw [Petitioner] and Pogue rolling on the ground. A jury could easily disbelieve [Petitioner's] account that Pogue sustained some eleven stab wounds, several penetrating his lungs, by repeatedly rolling onto the knife. Further, because the lighting was good enough for Lewis to identify the defendants and accurately testify to their actions, the jury could infer [Petitioner] would have been able to see Jimmy was not being seriously injured thereby refuting [Petitioner's] statement. In addition, the physical injuries sustained by the Blacks belie [Petitioner's] claim that he acted out of a fear for the safety of his brothers and himself as none of them were seriously injured. The physical injuries sustained by the victims corroborate that they were not in control of the fight. The jury could also infer a consciousness of guilt on behalf of [Petitioner] because he threw his knife into a nearby lake and fled the morning after the fight knowing, at the very least, Pogue had been seriously injured. *Because [Petitioner] went armed to an arranged confrontation and stabbed the victims numerous times in vital areas, a rational jury could find [Petitioner] knew and intended the natural consequences of these acts, that being the death of those he stabbed regardless of his statements to the contrary.*

Black, 2001 OK CR 5, ¶¶ 36-38, 21 P.3d at 1063-64 (footnotes omitted) (emphasis added).

Having thoroughly reviewed the trial transcript, the Court finds that the foregoing facts as determined by the OCCA are not unreasonable. The Court additionally finds that the OCCA's conclusion derived from these facts is also not unreasonable. Petitioner's continual assertion has been that he lacked the intent to kill Mr. Pogue, but did so out of fear for the safety of his brother, Jimmy. Intent, however, is rarely proven by direct evidence. Thus, "a jury is permitted to draw inferences of subjective intent from a defendant's objective acts." Wingfield v. Massie, 122 F.3d 1329, 1333 (10th Cir. 1997). Here, the jury's finding of an intentional killing is supported by evidence that Petitioner, along with his two brothers and two others, pursued the victims and initiated the attack against them, albeit due to a case of mistaken identity. Although the victims were outnumbered and unarmed, Petitioner attacked with a five-inch knife (Tr. II, 344). After stabbing Mr. Lewis 13 times, he stabbed Mr. Pogue 11 times. All but one of Mr. Pogue's stab wounds were to his head, back, and shoulder. Most of the wounds were three to five inches deep and many punctured his lungs (Tr. I, 271; Tr. II, 338-43; State's Exhibits 20 and 21). In light of these actions, the jury's verdict is supported by the evidence and within the bounds of reason. Petitioner's Ground Six is denied.

### 4. Ground Seven: Prosecutorial Misconduct.

In his Ground Seven, Petitioner complains about several comments made by the prosecutors during both first and second stage closing arguments. It is Petitioner's contention that such comments violated his constitutional rights. Petitioner raised an

exhaustive claim of prosecutorial misconduct on direct appeal. The OCCA denied relief. Black, 2001 OK CR 5, ¶ ¶ 95-97, 21 P.3d at 1077-78.

Generally, claims regarding improper prosecutorial argument are subjected to due process review. The question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). As the Supreme Court has acknowledged, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985). Thus, a fundamental fairness inquiry "requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002). The absence of an objection is relevant, as are "[a]ny cautionary steps - such as instructions to the jury - offered by the court to counteract improper remarks . . . ." Id. Ultimately, the focus is on whether the jury was able "to judge the evidence fairly in light of the prosecutor's conduct." Id.

A different standard applies, however, where a petitioner asserts the denial of a specific constitutional right. "When specific guarantees of the Bill of Rights are involved, . . . special care [is taken] to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly, 416 U.S. at 643. "[A] claim that the misconduct

51

effectively deprived the defendant of a specific constitutional right . . . may be the basis for habeas relief without proof that the entire proceeding was unfair." Paxton v. Ward, 199 F.3d 1197, 1217 (10th Cir. 1999). In the event of such error, harmless error analysis is employed. Matthews, 577 F.3d at 1186 ("In such a case, we review the harmfulness of the error using Brecht's 'substantial and injurious effect' standard.").

As previously noted, Petitioner raised an exhaustive claim of prosecutorial misconduct on direct appeal. As categorized by the OCCA, Petitioner alleged that

> the prosecutor(s) attempted to inject passion and sympathy into the first stage proceedings, improperly impeached a defense witness, improperly aligned themselves with the victim, jury and public, improperly evoked sympathy for the victims, ridiculed the defense theory, impugned defense counsel's character and credibility, expressed personal opinions, disparaged [his] family, equated [him] with Charles Manson, misstated the law, and misrepresented evidence.

Black, 2001 OK CR 5, ¶ 95, 21 P.3d at 1077-78. A good number of these claims have not been re-urged to this Court. While the OCCA did not address each individual comment, it assessed the conduct complained of to determine whether Petitioner was denied a fair trial. Id., 2001 OK CR 5, ¶ ___, 21 P.3d at 1078. It ultimately concluded that he was not. The OCCA held as follows:

> In the instant case a review of the record does not reveal conduct that so prejudiced [Petitioner] as to deny him the right to a fair trial. The trial court sustained each of defense counsel's objections to improper comments by the prosecutor. The majority of the remaining comments were within the latitude allowed during closing arguments. The prosecutor's comment invoking the name of Charles Manson and several personal digressions by Mr. Burns invoking victim sympathy were error. However, viewing the trial as a whole and the substantial evidence presented to prove statutory aggravators, these few comments did not rise to the level of reversible error. Although some of

the prosecutors' comments were borderline, none of them, singularly or cumulatively, rose to the level of reversible error. Accordingly, this proposition is denied.

Id. 2001 OK CR 5, ¶ 97, 21 P.3d at 1078. Because the OCCA addressed Petitioner's prosecutorial misconduct claim on the merits, this Court must give deference to its ultimate conclusion that no reversible error occurred. Douglas v. Workman, 560 F.3d 1156, 1179 (10th Cir. 2009); Bland, 459 F.3d at 1024.

Looking to the first stage, Petitioner's initial complaints concern comments of victim sympathy. In second closing argument, the prosecutor made the following comments:

Starting this case I don't know Bill Pogue. You folks don't know Bill Pogue. That's why you're here. And through the last few weeks talking to the family, talking to Rick, talking to Charles, talking to Lanetta his wife, I've gotten to know Bill Pogue.

MS. MADDOX: Objection, Your Honor, absolutely improper.

THE COURT: Let's not go into matters that are outside the record, Counsel.

MR. BURNS: You have gotten to know Bill Pogue through these statements of what happened, through those witnesses. You know he was a good person. You know we all try to be good people. I try to be a good husband, try to be a good father to my kids. We all try. Bill Pogue was a good person. He went one step further, something we should all strive for. He didn't deserve what happened to him. Now they want to ask questions. Why did they call Charles? Why did the D.A. call Charles? Charles is the last person to see his daddy alive. That's what you do in a Murder case. You start from what happened and you go to the last person who saw him alive. What did they tell you about how they came in the barn, seats are covered in blood? His daddy can't breath [sic]. He drives him to the hospital, has to roll down the window because he can't get oxygen. What's one thing Bill Pogue said? Take care of Rick. Take care of Rick. Bill Pogue knew at that moment he wasn't gonna make it. He knew. And when they get to the hospital, Charles

has to hold his dad down on the table while his dad struggles to get breath. Then he looks at Charles. Without saying a word, he says good-bye.

(Tr. III, 796-97).

Clearly, a prosecutor should not attempt to influence a jury's verdict by injecting sympathy for the victim. "The jury should make decisions based on the strength of the evidence, and not on raw emotion . . . ." Wilson v. Sirmons, 536 F.3d 1064, 1120 (10th Cir. 2008), *reh'g en banc granted*, 549 F.3d 1267 (10th Cir. 2008), *opinion reinstated by* Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009). While the OCCA found that some of the prosecutor's comments erroneously invoked victim sympathy, it did not distinguish which ones but ultimately found that no relief was warranted when the comments were viewed in light of the whole trial. Black, 2001 OK CR 5, ¶ 97, 21 P.3d at 1078. Applying AEDPA deference, the Court finds no fault with the OCCA's conclusion.

With regard to the first comment that the prosecutor had gotten to know Mr. Pogue, the record shows that Petitioner's objection was sustained and the prosecutor was admonished to contain his argument to the evidence presented. The prosecutor then channeled his personal comment to jury experience. With reference to the evidence presented, the prosecutor argued that the jury had come to know that Mr. Pogue was a good person (Tr. III, 796). While Petitioner complains about this characterization of the victim, it was not an original reference. On more than one occasion prior to the prosecutor's comment, defense counsel made the very same acknowledgment (Tr. II, 317, 579; Tr. III, 746, 762, 767). Given that the defense agreed with the prosecution on this point and so

advised the jury, it is clear that the prosecutor's reference did not have an inappropriate effect on the jury's consideration of the evidence.

In the final comment, the prosecutor recounted the testimony of Charles Pogue, the victim's son. Charles drove the victims to the hospital and was with his father when he died. Without any objection from Petitioner, he testified about these events (Tr. II, 564-78).[17] In closing argument, defense counsel questioned the prosecutor's motive for presenting Charles for testimony.

> Before I get started, I want to say this. There is no doubt that Mr. Pogue was a good man. There is no doubt. That many people don't support you unless you're a good man. And Rick Lewis and Charles Pogue, there is no doubt. They're all good. But that's not what this is about. The Instructions tell you that sympathy and sentiment should not get into your verdict, but that you should follow the law, and that's what that's about. You got to ask yourself why did they call Charles Pogue to that stand as the very last witness. They didn't need to put him through that. They had proven to you that his father died. They had proven to you how he died. Charles Pogue didn't give you one thing that you need to go decide this case other than to let you know

---

[17] While Petitioner notes within his prosecutorial misconduct claim that Charles' testimony was improper *victim impact* testimony, there was no objection to the testimony at trial and Petitioner has not raised an independent claim regarding the admission of this evidence. Petitioner has alleged that his trial counsel was ineffective for failing to object to Charles' testimony and that his appellate counsel was ineffective for failing to raise a claim of trial counsel ineffectiveness predicated on the failure to object. The merits of these claims, however, are not before the Court because they are procedurally barred. In addition, while Petitioner did argue on direct appeal (and within the context of this prosecutorial misconduct claim presented there) that the prosecutor's questioning of Charles was a "flagrant attempt *to inject passion and sympathy* into the first stage proceedings[,]" Petitioner did not claim any *victim impact* error as now alleged. Appellant's Brief, Case No. D-1999-249, pp. 90-91 (emphasis added). See also Black, 2001 OK CR 5, ¶ 95, 21 P.3d at 1077 (characterizing Petitioner's direct appeal claim as one of victim sympathy). Such claim is, in any event, meritless. Victim impact evidence is "evidence about the victim and about the impact of the murder on the victim's family . . . ." Payne v. Tennessee, 501 U.S. 808, 827 (1991). In the present case, Charles gave no such impact testimony. To the contrary, Charles' testimony was a first-hand account of his actions and observations as an involved participant immediately after the altercation.

how good his father was, and I have no doubt about that.  But that was to raise your sympathy and raise your sentiment.  And that's not fair.  And I don't mean any disrespect to him.  He's a good man I'm sure, and none of this should have ever happened.  But ask yourself when you get back there why did they call him as the last witness other than to let you raise your sympathy and sentiment and hatred for that man.  Ask yourself that.

(Tr. III, 746-47).  In response to the comment complained of by Petitioner, the prosecutor explained why he called Charles and then discussed his actual testimony.

While the prosecutor's reference to Charles' testimony was emotionally charged, it did not undermine the fairness of his trial.  Given defense counsel's initial reference to the testimony, it is clear that the prosecutor's comment was in response thereto.  While the doctrine of invited error will not excuse every prosecutorial response, it is relevant to examine "defense counsel's opening salvo" and weigh the comments against one another.  If a prosecutor's response is nothing more that a "'right[ing of] the scale,'" then reversal is unnecessary.  Young, 470 U.S. at 12-13.  While the prosecutor's response may have tipped the scale a bit more than necessary, it cannot be overlooked that the prosecutor's comments were based on the admitted (and unobjected to) evidence.  See Malicoat v. Mullin, 426 F.3d 1241, 1255 (10th Cir. 2005) (addressing a victim sympathy claim where the prosecutor conducted a substantial portion of his argument in the voice of the deceased victim and finding no error where the prosecutor's argument was based on the evidence presented).

In addition, the very issue regarding the jury's consideration of this evidence was brought to a head by defense counsel.  Directing the jury to the given instructions, defense counsel singled out Charles' testimony and told them that they were not to let sympathy and

sentiment enter into their deliberations (Tr. III, 746-47).  The jury was in fact so instructed [O.R. (CF-99-01) 103-04].[18]  See Wilson, 536 F.3d at 1120 ("We assume, without more, that the jury followed this instruction.").  In light of all these circumstances, the matter was well-vetted before the jury and the jury was well-educated about its consideration.  Thus, as the OCCA determined, the prosecutor's argument does not equate to a denial of due process.

Petitioner additionally complains about a line of argument, also occurring in the first stage, which began in the State's first closing argument.  At the onset of his argument, one of the prosecutors discussed why he was a prosecutor.  In particular, he stated, "Why am I doing this?  Well, I can tell you very plainly because of this case" (Tr. III, 728).  Petitioner's complaint with the argument is that it singled out his case as "a particularly worthy prosecution" in an attempt to push the verdict from manslaughter to malice murder.  Petitioner additionally contends that this argument continued into second closing argument, adding a victim sympathy component.  Petition, pp. 72-73.  There, a second prosecutor stated, "We are prosecutors because we believe in what we do because we have a chance to come in front of you and speak for those who cannot speak" (Tr. III, 791).

Regarding the initial reference, there was no objection made and looking to the statement in context, the argument was reasonable and without any undue characterization of the case at hand.  After the comment cited above, the prosecutor continued with "we're

_____

[18] Instruction No. 29 read in pertinent part, "You should not let consideration of mere sympathy, sentiment or prejudice enter into your deliberations, but should discharge your duties as jurors impartially, conscientiously and faithfully under your oath and return such verdict as the evidence warrants when measured by these instructions."

here to ascertain right from wrong," including himself, the jury and the court system within the term "we" (Tr. III, 728). The prosecutor then stated:

> And when we make that determination, specifically in this case, you're going to look at the facts, the evidence which has been brought to you and the photographs, from the witness stand and from the testimony, and you're going to decide based upon the law, the Instructions you receive, whether or not the actions of the Defendant were right or wrong.

(Tr. III, 728-29). Within this additional argument, the prosecutor qualified the jury's role and stated that its verdict in the case would be arrived at by an assessment of the presented evidence in light of the law as set forth in the instructions. This is a correct statement of the law, and when the prosecutor's complained of comments are considered in light of this additional argument, they are not unreasonable and do not amount to a due process infringement.

As this argument continued in second closing, however, the remarks crossed an acceptable line. When the second prosecutor stated that he was there to "speak for those who cannot speak[,]" this was clearly an appeal for sympathy. In addition, when he noted immediately thereafter that the first prosecutor "is a Christian[,]" this, too, was both irrelevant and improper (Tr. III, 791). While the first of these comments drew no objection, the second one did. The trial court found the second comment to be irrelevant and it directed the prosecutor to stay away from that sort of argument (Tr. III, 791-92).

While these comments were error, the OCCA's determination that these comments did not warrant relief is not unreasonable. Again, as noted above, the jury was instructed not to consider sympathy in its deliberations, and it is presumed that the jury followed this

instruction.  In addition, and with respect not only to these erroneous comments but all comments asserted as error in the first stage, the evidence of guilt was so overwhelming that it is abundantly clear that the argument of the prosecutor had little or no effect on the verdict rendered.  See Darden v. Wainwright, 477 U.S. 168, 182 (1986) (finding the heavy weight of the evidence "reduced the likelihood that the jury's decision was influenced by argument").  From the onset of trial, Petitioner repeatedly admitted that he killed Bill Pogue.  Admitting the crime of manslaughter, Petitioner's only challenge to the guilt stage evidence was to the issue of intent (Tr. I, 112, 122, 125, 128, 134, 137, 205, 218; Tr. III, 757-58, 766, 771-73).  Under these circumstances, it cannot be said that the prosecutor's comments undermined the fundamental fairness of the guilt stage.

Looking to the second stage, Petitioner cites four instances in second closing where the prosecutor made allegedly improper comments.  Petitioner's first complaint concerns the following argument:

> Defense Counsel briefly, in her opening statement, she made a few comments.  She talked about – again about beliefs in God and greater power, and we've already talked about that.  There'll be a judgment day for Johnny Black.  He can seek forgiveness from his maker however he chooses fit.  God may decide to forgive him.  That's between he and God.  We're not in a position of judgment on Mr. Black's moral character here or whether he's gonna go to heaven.  That's not what we're here about.  *And Defense Counsel also said judging Johnny Black's life.  Ladies and Gentleman, we're not judging his life.  We're judging the actions that caused the death of Bill Pogue, Cecil Martin and Rick Lewis [sic].*

> MS. MADDOX:  Objection, Your Honor, we are not just judging those things.  Mitigating circumstances exist.

> THE COURT: I think that the statement is proper. I will allow the statement and note your exception. Go ahead.

> MR. BURNS: . . . *We're judging these facts here. We're judging what this man has done.*

(Tr. IV, 999-1000) (emphasis added). It is Petitioner's contention that this line of argument violated Supreme Court precedent concerning individualized sentencing in capital cases. Citing Caldwell v. Mississippi, 472 U.S. 320 (1985), Petitioner asserts that this argument diminished the jury's sentencing responsibility. Citing Lockett v. Ohio, 438 U.S. 586 (1978), and its progeny, Petitioner additionally asserts that the prosecutor's comments directed the jury away from consideration of relevant mitigating circumstances.

Before proceeding to the merits of this argument, the issue of deference must first be addressed. Petitioner has claimed that the OCCA failed to consider this particular comment, and thus he asserts that no deference is due its ultimate determination that no relief was warranted on this prosecutorial misconduct claim. Clearly, the OCCA did not specifically address this claim. In considering Petitioner's prosecutorial misconduct claim, the OCCA set forth the laundry list of particular allegations and then addressed them as a whole. Black, 2001 OK CR 5, ¶ 95-97, 21 P.3d at 1077-78. At the onset, the OCCA set forth the general applicable law; however, in so doing, the OCCA did make the statement that sustained objections were cured and that plain error would apply to "the remaining remarks" which were not objected to. Id., 2001 OK CR 5, ¶ 96, 21 P.3d. at 1078. Petitioner relies upon this language to assert that since the above-referenced comment was objected to but overruled, it was overlooked.

60

If viewed in isolation, Petitioner's contention might have merit. However, additional language in the OCCA's opinion supports the conclusion that this argument was duly considered. First, in listing Petitioner's prosecutorial allegations, the OCCA specifically noted that Petitioner complained that the prosecutor misstated the law. Id. 2001 OK CR 5, ¶ 95, 21 P.3d at 1077. This is how Petitioner himself characterized this particular allegation on appeal. Appellant's Brief, Case No. D-1999-249, pp. 97-98. Second, after making a reference to the general law, the OCCA went on to apply it to the case at hand. Particularly, the OCCA stated:

> *In the instant case* a review of the record does not reveal conduct that so prejudiced [Petitioner] as to deny him the right to a fair trial. The trial court sustained each of defense counsel's objections to improper comments by the prosecutor. The majority of the remaining comments were within the latitude allowed during closing arguments....Although some of the prosecutors' comments were borderline, none of them, singularly or cumulatively, rose to the level of reversible error.

Black, 2001 OK CR 5, ¶ 97, 21 P.3d at 1078 (emphasis added) (citation omitted). Given the OCCA's express acknowledgment of the issue raised and the above-referenced portion of the OCCA's opinion collectively discussing Petitioner's allegations of prosecutorial misconduct, the Court finds that the OCCA did consider the merits of this particular complaint. Accordingly, deference is due "the state court's *result*, even if its reasoning is not expressly stated." Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999).

The Court finds no merit to Petitioner's alleged Caldwell error. In addition to the fact that Petitioner did not rely on Caldwell in the presentation of this claim to the OCCA, the prosecutor's argument simply does not amount to a Caldwell infringement. In Caldwell, the

Supreme Court found that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell, 472 U.S. at 328-29. Nothing in the prosecutor's argument "improperly described the role assigned to the jury by local law." Dugger v. Adams, 489 U.S. 401, 407 (1989).

In Lockett, the Supreme Court concluded that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604 (footnotes omitted). By arguing that "we're not judging his life[,]" Petitioner contends that Lockett was violated (Tr. IV, 999).

"[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly, 416 U.S. at 647. Thus, while Petitioner urges that this comment foreclosed the jury's due consideration of mitigation circumstances, the Court simply cannot agree. The prosecutor's comment followed argument about heaven and final judgment. The prosecutor argued that it was not the jury's job to decide whether or not Petitioner would go to heaven. In this context, the

complained of comment was just additional argument in this line of argument (Tr. IV, 999).[19] There is no indication that the jury considered the comment as anything more.

In addition, there was additional argument concerning the mitigating factors and the jury's consideration thereof. In first closing, the prosecutor, with reference to the instructions, discussed the jury's consideration of mitigating factors (Tr. IV, 969-71). Obviously, defense counsel referred to them and told the jury that "individual consideration" was required (Tr. IV, 986). Finally, the aggravating circumstances were discussed throughout closing arguments as well. Because two of the aggravating circumstances, continuing threat and prior violent felony, were intertwined with an assessment of Petitioner's life, it is unlikely that the prosecutor's comment about judging Petitioner's life was taken beyond the eternal context. Given the argument for both aggravating and mitigating circumstances, the jury clearly understood that while it was not required to judge his soul, it was to consider both the good and bad of Petitioner's life in its assessment of an appropriate penalty. The instructions enforced this principle as well. Accordingly, the OCCA was correct to deny relief in this instance.

---

[19] This line of argument was made in response to the following argument by defense counsel:

> But that is the reality of what happens when you consider the life and death of other people. That's why I and a lot of the people in this world are comfortable with the fact that someone higher above us makes that decision,....I don't think any of you all have rooms on your shoulder for that much. I don't think any of us were intended to have that much room on our shoulders.

(Tr. IV, 979).

Next, Petitioner complains about the prosecutor's comment comparing murders. Petitioner contends that this argument as well had the effect of directing the jury away from properly considered evidence, namely, the circumstances of the offense. The argument was as follows:

> [Defense counsel] wants to compare murders. We don't compare murders say this murder deserves death, this one doesn't. That's not the way our system works. We don't have to be compared to Bundy or Steakhouse murders. That's not – we're comparing what he did, his facts on these two murders and this stabbing.

(Tr. IV, 1000). There was no objection to the comment, and the record reflects that the comment was made in response to defense counsel's comment that Petitioner was not a killer like Ted Bundy, Jeffeyy Dahmer, or Roger Dale Stafford (Tr. IV, 979). The Court finds that the comment was not improper and did not direct the jury from properly considered evidence. The comment did in fact specifically direct the jury to consider the facts and circumstances at hand.

Continuing from the first stage, Petitioner singles out another comment by the prosecutor in the second stage which he asserts was an improper digression to garner victim sympathy (Tr. IV, 1004-05).[20] It was. As the Tenth Circuit has recognized, "it is

---

[20] While the OCCA did not single out the victim sympathy comments it found to be error, it is likely that this comment was included therein. Black, 2001 OK CR 5, ¶ 97, 21 P.3d at 1078. The prosecutor's argument was as follows:

> She makes the comments family will be able to visit him. Fine. Through a plexiglass window, I won't be able to touch. Fine. He'll have T.V.s, weight bench. Fine. Where is Bill Pogue's T.V.s? Where's his weight benches? Where is his family contact? Bill Pogue won't get to develop relationships with his family. The only contact they have is going to be out here at the Dibble (sic) cemetery. He won't

prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." <u>Bland</u>, 459 F.3d at 1028. Such is what happened here and it was improper. Also found to be error by the OCCA was the final comment complained of by Petitioner involving the prosecutor's reference to Charles Manson (Tr. IV, 1000-01).[21] Despite the erroneous nature of these comments, however, the Court concludes, as the OCCA likewise found, that the comments did not deny Petitioner a fundamentally fair proceeding. As the OCCA concluded, "viewing the trial as a whole and the substantial evidence presented to prove statutory aggravators, these few comments did not rise to the level of reversible error." <u>Black</u>, 21 P.3d at 1078. In the present case, the jury found four aggravating circumstances, all of which were amply supported by the evidence. In addition to the circumstances of the crime itself, which involved multiple, severe stab wounds to more than one person, evidence of Petitioner's prior manslaughter conviction, escape from jail

---

develop a relationship with the eighteen day old baby that was his grandchild that was there. You know, and you heard he had a hunting and fishing wagon. I went hunting Sunday. The sun was setting and my bird dogs were pointing, and I'm thinking of Bill Pogue. He won't be able to spend time with his family doing things he wants. So all this whining saying oh, this is what's gonna happen, I'm gonna have family there, this and that, it's not this pleasant life. Where is Bill Pogue?

(Tr. IV, 1004-05).

[21] Given the OCCA's finding that the comment was erroneous but unworthy of relief, as well as the Court's ultimate conclusion that the comment did not in any event render Petitioner's trial fundamentally unfair, it is unnecessary to address the propriety or impropriety of this comment. Nevertheless, and as previously noted herein, the record does reflect that defense counsel was the first to introduce infamous murderers into the discussion (Tr. IV, 979).

while awaiting trial, and threats to harm others[22] offered overwhelming support for Petitioner's sentence. Thus, it cannot be said that these comments, or the other second stage comments alleged as error, affected the outcome of the sentencing stage.

In summary, for the reasons set forth above, the Court finds that Petitioner is not entitled to relief on his claim of prosecutorial misconduct. Finding nothing unreasonable in the OCCA's determination that Petitioner was not denied a fundamentally fair trial, the Court defers to that finding.

## 5. Ground Eight: Voir Dire.

In his Ground Eight, Petitioner complains about voir dire. Petitioner's particular complaint concerns veniremen Williams and Skiles and the state trial court's questioning of them regarding their ability to consider the death penalty as a possible punishment. Given their different responses to the same question, Petitioner asserts that "there was no answer to the 'follow the law' question that would qualify a juror who had reservations about the death penalty to serve." Petition, p. 75.

On direct appeal, Petitioner asserted that four veniremen, Williams, Skiles, Adams, and Richard, were excused for cause in violation of Witherspoon v. Illinois, 391 U.S. 510 (1968), Adams v. Texas, 448 U.S. 38 (1980), and Wainwright v. Witt, 469 U.S. 412 (1985).

---

[22] In his statement to police, Petitioner threatened to kill Cal Shankles ("I tell you right now, if I get my hands on him, I ain't going to use no knife, I'm going to beat him to death. . . . I'm going to get him one of these days and I'm . . . going to kill him. . . . He's going to get what he's got coming.") (State's Exhibit 26, p. 26). When he escaped from the county jail, Petitioner left the county sheriff a note in which he aired his grievances against him and stated, "Maybe I'll see you some time late at nite [sic]." (State's Exhibit 51.)

Petitioner contended that Williams should not have been excused given her negative answer to the following question:

> Now, if you found, Ms. Williams, that beyond a reasonable doubt the Defendant was guilty of Murder in the First Degree, and if under the evidence, the law and the circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law, the facts and the circumstances, you would not consider inflicting a death penalty?

(Tr. I, 67). Petitioner additionally asserted that none of these veniremen should have been excused in absence of further questioning and/or rehabilitation by defense counsel. Appellant's Brief, Case No. D-1999-249, pp. 41-44.

In response to Respondent's allegation that the claim now raised by Petitioner is different than the one raised on direct appeal and is therefore unexhausted, Petitioner has replied that his habeas claim concerns Williams and her removal from the jury panel by the state trial court. Petitioner states, "Not only was the issue raised, the Oklahoma Court decided it." Reply, p. 23. The Court accepts Petitioner's characterization of his own claim and therefore finds that it is in fact exhausted.[23]

In Witherspoon, the Supreme Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 522. In

_____

[23] While Petitioner reasserted this claim in his second post-conviction application, it is of no consequence since the issue was fully resolved on direct appeal.

Witt, the Supreme Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Witt, 469 U.S. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). In reviewing a Witherspoon/Witt issue, deference is afforded the trial court's decision. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht v. Brown, 551 U.S. 1, 9 (2007). In addition, the trial court's decision is a factual determination presumed correct under 28 U.S.C. § 2254(e)(1). Witt, 469 U.S. at 429.

The record reflects that Williams first responded to the trial court's general inquiry regarding consideration of the three permissible punishments by stating, "I don't think I could give the death penalty" (Tr. I, 67). When questioned further, Williams answered "No sir" to the question set forth above. The trial court excused her and denied a request from defense counsel to attempt to rehabilitate her. Regarding Williams, the trial court additionally stated, "I think it's pretty positive that I couldn't keep her in anyway[,]" and "I asked her if she could consider [the death penalty] and she said no." To this last comment, defense counsel stated, "And I agree . . ." (Tr. I, 67-69).

In addressing this issue on appeal, the OCCA acknowledged that "'[r]emoval for cause of even one venire member who has conscientious scruples against the death penalty

but is nevertheless able to set aside those scruples and consider the penalty of death and is therefore eligible to serve on the jury is error of constitutional magnitude not subject to harmless error analysis.'" <u>Black</u>, 2001 OK CR 5, ¶ 25, 21 P.3d at 1060. The OCCA then concluded as follows:

> Although a literal reading of Williams' answer indicated that she may be able to consider the death penalty, the parties understood otherwise. During counsel's argument to rehabilitate Williams, the trial court stated he asked Williams if she could consider imposing the death penalty and she said no. Counsel agreed, but argued Williams needed more information to definitively decide. In denying counsel's request to rehabilitate and provide more information, the trial court stated that jurors who cannot consider the death penalty are "indicating they cannot follow the Instructions of the Court." A review of the transcript reveals all parties present understood Williams meant she could not impose the death penalty. Based on this record, we defer to the trial court and find no abuse of discretion in dismissing Williams for cause.

<u>Id.</u>, 2001 OK CR 5, ¶ 28, 21 P.3d at 1061.

The OCCA's determination of the issue is consistent with the Supreme Court authority cited above. Upon questioning Williams, the trial court determined that Williams' "no" answer meant that she would not consider the death penalty as a punishment option. Just like the OCCA, this Court defers to the trial court's determination, one supported by defense counsel's own stated agreement and the very fact that defense counsel sought the opportunity to rehabilitate her. Given the record support, the Court finds that Petitioner has not rebutted the presumption of correctness afforded the trial court's decision.[24] Similar to

---

[24] In attacking the OCCA's decision, Petitioner asserts that the OCCA "compounded the problem by denying a requested hearing on juror issues." Petition, p. 78. A review of the record reveals that Petitioner did not request an evidentiary hearing on this particular juror issue. <u>See</u> Application for Evidentiary Hearing on Jury Issues, Case No. D-1999-249 (Jan. 3, 2000).

the situation addressed in Witt, "[t]here is nothing in this record which indicates that anybody had trouble understanding the meaning of the questions and answers with respect to [the potential juror]. One of the purposes of § 2254(d) was to prevent precisely this kind of parsing of trial court transcripts to create problems on collateral review where none were seen at trial." Witt, 469 U.S. at 435.

Where the record bears out that all present during the questioning of Williams understood her answer to mean that she could not consider the death penalty even if permitted "under the evidence, the law and the circumstances of the case," such is not eviscerated by the fact that Skiles was later excused for answering the same question in the affirmative (Tr. I, 67, 71). With regard to the particular question posed, the Tenth Circuit has acknowledged that it is one which can "invite[] ambiguous answers." Davis v. Maynard, 869 F.2d 1401, 1408 (10th Cir. 1989), *vacated by* Saffle v. Davis, 494 U.S. 1050 (1990), *reinstated by* 911 F.2d 415, 418 (10th Cir. 1990). "Thus, where some ambiguity appears in the record, the judge, considering the questioning as a whole and using his sound discretion, was entitled to resolve the issue of juror bias in favor of the State." Id. at 1409. Petitioner is not entitled to relief on his Ground Eight.

### 6. Ground Nine: Batson Violation.

In his Ground Nine, Petitioner alleges a violation of Batson v. Kentucky, 476 U.S. 79 (1986). The crux of Petitioner's complaint is the prosecution's use of a peremptory challenge

to remove an African-American from the jury panel.[25]  While the prosecutor provided a race-neutral reason for his removal, a prior criminal conviction which he did not disclose when asked, Petitioner asserts, as he did on direct appeal, that the stated reason was pretextual given that the prosecution did not challenge a white juror who also failed to timely disclose a prior criminal conviction and ultimately served on his jury.

Batson stands for the well-established principle that a prosecutor cannot use a peremptory challenge to remove potential jurors "solely on account of their race."  Batson, 476 U.S. at 89.  In Batson, the Supreme Court set forth the standard to evaluate such claims.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (citing Batson) (citations omitted).  Regarding the second step, it is clear that a prosecutor "must present a comprehensible reason"; however, the explanation given need not be either persuasive or plausible.  "[S]o long as the reason is not inherently discriminatory, it suffices."  Rice v. Collins, 546 U.S. 333, 338 (2006).  In the final step, the trial court evaluates the prosecutor's given explanation, and it is here "that the persuasiveness of the justification becomes relevant . . . ."  Purkett v. Elem, 514 U.S. 765, 768 (1995).  With the understanding "that the ultimate burden

---

[25] In Powers v. Ohio, 499 U.S. 400, 402 (1991), the Supreme Court held that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races."

of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike[,]" it is here that the trial court "determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Id.

Because the trial court's decision is in essence an assessment of the prosecutor's credibility, it is a factual determination afforded great deference. Batson, 476 U.S. at 98 n.21. As noted in Hernandez,

> the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.

Hernandez, 500 U.S. at 365. In the habeas context, this deference is not only acknowledged but magnified by the provisions of the AEDPA. As a question of fact, both 28 U.S.C. § 2254(e)(1) and 28 U.S.C. § 2254(d)(2) are implicated. Thus, in order to prevail before this Court, Petitioner "must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, . . . and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." Miller-El, 537 U.S. at 348 (citation omitted).

The record reflects that the prosecution's first peremptory challenge was used to excuse Clarence Castle, an African-American. When Petitioner objected on Batson grounds, the trial court asked the prosecutor to explain his reason for striking him. The prosecutor responded as follows:

> Your Honor, because Mr. Castle – our records do indicate that Mr. Castle previously was charged in 1997 with Burglary in the First Degree. It

was later reduced and re-filed as a Misdemeanor Assault and Battery. What concerns me more though is the fact that "A", he was charged, but "B", he never indicated he was charged, Your Honor. That's what concerned the State of Oklahoma.

(Tr. I, 153). While Petitioner argued that a question regarding a criminal past was never asked, the trial court noted otherwise, and the record does show that the trial court posed this question twice and that the prosecutor re-asked the question as well (Tr. I, 56, 86, 103-06, 153-54). The trial court found that the explanation given by the prosecutor was "reasonable" (Tr. I, 154). In response to Petitioner's urging that the prosecutor back up his race-neutral reason by being required to ask every selected juror about any misdemeanor offense, the trial court denied the request as not required by Batson. The trial court also denied Petitioner's request for background checks on all the jurors (Tr. I, 154-55). Prior to trial, Petitioner had requested that the prosecution produce any information it had on the potential jurors, including criminal background checks. This request was denied [O.R. (CF-98-04) 198-99; O.R. (CF-99-01) 3; M. Tr. 8/19/98, 29, 36-37, 40-41, 79-80].

On direct appeal, Petitioner argued that the prosecutor's stated reason for removal was pretextual. In support of the argument, Petitioner filed an Application for Evidentiary Hearing on Jury Issues. See fn.24, supra. In the application, Petitioner provided information showing that a white juror, Scott Felz, had a prior misdemeanor conviction which he did not disclose. Because the prosecutor did not seek to remove this white juror on the same ground as Mr. Castle, Petitioner asserted that the prosecutor's peremptory challenge to Mr. Castle was racially motivated in violation of Batson.

Applying Batson, the OCCA denied Petitioner relief.  Black, 21 P.3d at 1061-62.  In so doing, the OCCA found as follows:

> The prosecutor in this case removed prospective juror Castle because Castle failed to disclose he had been accused of first degree burglary that was later dismissed and refiled as misdemeanor assault and battery.  The record shows Castle did not respond when the panel was asked if they had been accused or involved in a criminal matter.  The record further shows the prosecutor removed a white juror [James Coy] who belatedly disclosed his prior misdemeanor criminal record.  As we stated in Short, 1999 OK CR 15, at ¶ 15, 980 P.2d at 1092, excusal of a potential juror because of a prior criminal record is a legitimate reason for removal.  Here, the trial court accepted the prosecutor's race-neutral explanation for striking Castle and rejected [Petitioner's] assertion that the reasons were pretextual.  Because the trial court's ruling upholding the challenge is supported by the record and not clearly erroneous, we find no Batson error.

Id. (footnotes omitted).  The OCCA also denied Petitioner's request for a hearing.  While considering the evidence regarding Mr. Felz, the OCCA found that it did not alter its decision, given that the prosecutor had used another peremptory challenge to remove a white juror with prior convictions.  Id. at 1062 n.10.

Comparative juror analysis is a factor to consider when determining whether purposeful discrimination has occurred.  United States v. Nelson, 450 F.3d 1201, 1207-08 (10th Cir. 2006) (citing Miller-El v. Dretke, 545 U.S. 231 (2005)).  As defined in Nelson, comparative juror analysis involves "'side-by-side comparisons of some black venire panelists who where struck and white panelists who were allowed to serve' in order to determine whether 'a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve . . . .'"  Id. (quoting Miller-El, 545 U.S. at 241).  In the present case, Petitioner undoubtedly discovered

information subsequent to trial which casts doubt on the prosecution's stated reason for removal. The Supreme Court has acknowledged, however, that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." <u>Snyder v. Louisiana</u>, 552 U.S. 472, 128 S.Ct. 1203, 1211 (2008). In <u>Snyder</u>, the Court nevertheless conducted a comparative analysis because the relevant information was thoroughly explored by the trial court and set out in the voir dire transcript. <u>Id.</u>

Unlike <u>Snyder</u>, what the record bears out and what Petitioner relies upon to make a comparative analysis after the fact is limited. Petitioner seeks relief by simply comparing the criminal history of Mr. Castle with that of Mr. Felz. The OCCA looked at this evidence, but in effect found it neutralized by the fact that the record shows that like Mr. Castle, a white juror with a criminal history, Jerry Coy, was also removed by the prosecutor's peremptory challenge (Tr. I, 103-06, 155). Thus, despite Petitioner's new evidence regarding Mr. Felz, which was duly considered by the OCCA, Petitioner has failed to show by clear and convincing evidence that the trial court's factual determination was incorrect. Petitioner has also failed to show that the trial court's and the OCCA's resolution of the issue was objectively unreasonable.[26] Thus, Petitioner's Ground Nine must be denied.

---

[26] While other factors may be evaluated to determine the existence of purposeful discrimination, Petitioner has sought relief only upon a comparison of Mr. Castle and Mr. Felz. <u>See</u> <u>Nelson</u>, 450 F.3d at 1207-08 (listing a variety of factors considered by the Supreme Court in <u>Miller-El</u>).

Resolution of this issue is unaffected by Petitioner's additional but related claim regarding his access to the criminal history of the potential jurors. As noted above, Petitioner's request for this information was denied at trial, and on appeal, the OCCA found that the trial court did not abuse its discretion in denying Petitioner's repeated requests for this information. Black, 2001 OK CR 5, ¶¶ 17-18, 21 P.3d at 1058. In the recent case of United States v. Brown, 553 F.3d 768 (5th Cir. 2008), the Fifth Circuit addressed a similar claim. In Brown, the Fifth Circuit held that Batson does not require the prosecution to provide the defense with the results of its investigation of the jury panel members. Nor is the prosecution required to make any showing that its investigatory process was utilized consistently among all potential jurors. "Such a test would add a 'discriminatory investigation' prong to Batson. While Miller-El may represent the current high water-mark in terms of evidence called for in Batson inquiries, we see no indication that mark reaches this high." Brown, 553 F.3d at 797. As in Brown, Petitioner was not prevented from conducting his own investigation of the jurors' criminal past. In addition, as the OCCA found, Petitioner could have expounded upon the questions posed by both the trial court and the prosecution "to further educate [himself] about the panel." Black, 2001 OK CR 5, ¶ 18, 21 P.3d at 1058.

**7.    Ground Ten:  Jury Consideration of Extraneous Information.**

In his Ground Ten, Petitioner alleges that his constitutional rights were violated by the jury's consideration of extraneous information. With reference to an affidavit of one of the jurors obtained after trial and submitted to the OCCA in support of his Application for

Evidentiary Hearing on Jury Issues, Petitioner asserts that the deliberation process was improperly influenced by another juror's revelation regarding the crime scene and his belief that the victims would not have been able to go around Petitioner "because of a ditch that was there on the side of the road." Exhibit 2, Application for Evidentiary Hearing on Jury Issues, Case No. D-1999-249 (Jan. 3, 2000). The OCCA reviewed this claim and denied relief. In particular, the OCCA held:

> Both Lewis and Charles Pogue testified Pogue could not go around the Neon because of the bar ditches. Nowhere in the affidavit does the juror state that she or the other jurors relied on this unnamed juror's opinion rather than on the evidence. Given that this affidavit does not support a finding that the jury relied on extraneous information, the request for an evidentiary hearing is denied.

Black, 2001 OK CR 5, ¶ 69, 21 P.3d at 1072 n.24.

Undoubtedly, a "verdict must be based upon the evidence developed at the trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). When presented with a ground for relief claiming a violation of these due process guarantees, the habeas court applies the Brecht standard. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (setting forth the harmless-error standard to be applied in habeas review). Thus, the focus is "whether the extraneous material to which the jury was exposed had a 'substantial and injurious effect' on

the verdict." Matthews, 577 F.3d at 1181-82. See also Vigil v. Zavaras, 298 F.3d 935, 940 (10th Cir. 2002).

In the present case, the OCCA determined that the affidavit presented by Petitioner did not demonstrate an influenced verdict. In the first instance, this information was not completely extraneous. Extensive evidence had been introduced regarding the subject matter, and two witnesses had specifically expressed their opinion that the Blazer would not have been able to go around the Neon.[27] See Section III.C.1., supra. Second, the affidavit gave no indication that the information provided by the unnamed juror was relied upon or even considered in place of or in addition to the already admitted evidence. The Court finds the OCCA's resolution of the issue to be reasonable. In Vigil, the Tenth Circuit listed factors to be considered when determining whether outside information influenced a jury's verdict. Among those factors are "the degree to which the jury discussed and considered the extrinsic information" and "whether the extrinsic evidence merely duplicates evidence properly before the jury." Vigil, 298 F.3d at 941. While both of these factors were considered by the OCCA, the Court finds that the last factor is ultimately determinative in the present case. See also Hughes v. Borg, 898 F.2d 695, 700 (9th Cir. 1990) ("[A] number of federal courts have recognized that extraneous material which is duplicative or cumulative may render a jury misconduct error harmless."). Given the evidence already admitted, the information offered

---

[27] While Petitioner additionally asserts that the unnamed juror's information was wrong, the Court disagrees. As previously discussed herein, the issue was disputed. Because both vehicles left the scene, the position of the vehicles on the road could not be readily determined. The testimony regarding the position of the Neon varied and it was disputed whether or not the Blazer would have been able to safely navigate around it.

by the unnamed juror cannot be said to have had a substantial and injurious effect on the jury's verdict of guilt. The OCCA's decision is therefore not an unreasonable one. Petitioner is denied relief on his Ground Ten.

### 8. Ground Twelve: Heinous, Atrocious, and Cruel Aggravator.

In his Ground Twelve, Petitioner attacks the constitutionality of Oklahoma's heinous, atrocious, and cruel aggravator. While acknowledging the Supreme Court's decision in Maynard v. Cartwright, 486 U.S. 356 (1988), as well as subsequent decisions from the OCCA in compliance therewith and Tenth Circuit opinions approving of the OCCA's narrowing of the aggravator, Petitioner nevertheless asserts that the use of the aggravator once again resembles the "catch-all" approach invalidated in Cartwright. Petitioner contends that "[i]n Oklahoma, there is simply no consistent or reasoned basis upon which a murder can confidently be excluded as especially heinous, atrocious, or cruel." Petitioner additionally asserts error in that the jury was not instructed that in order to find the heinous, atrocious, and cruel aggravator, it had to find conscious physical suffering beyond a reasonable doubt. Petition, pp. 95-99.

Petitioner raised this claim on direct appeal and was denied relief. The OCCA's holding was two-fold. First, the OCCA denied the constitutional challenge. Upholding its previously-stated position on the issue, the OCCA held that the aggravator was neither unconstitutionally vague nor overbroad. Black, 2001 OK CR 5, ¶ 78, 21 P.3d at 1073-74. Second, the OCCA found that the aggravator was supported by sufficient evidence. In so doing, the OCCA noted that it "upholds a jury's finding of this aggravating circumstance

when it is supported by proof of conscious serious physical abuse or torture prior to death; evidence a victim was conscious and aware of the attack supports a finding of torture and serious physical abuse." Id. 2001 OK CR 5, ¶ 79, 21 P.3d at 1074. The OCCA went on to find sufficient evidence based on the following facts:

> The evidence showed [Petitioner] forced Pogue to stop his vehicle after which [Petitioner's] brothers attacked Pogue and Lewis. During the fight, [Petitioner] stabbed both men numerous times. The evidence further showed Pogue was conscious and alive suffering pain during and after the attack.

Id.

Petitioner has failed to show that the decision of the OCCA on this issue is contrary to or an unreasonable application of Supreme Court law. Clearly, Maynard required that Oklahoma narrow the application of its heinous, atrocious, and cruel aggravator, and beginning with Stouffer v. State, 1987 OK CR 166, ¶ 6, 742 P.2d 562, 563, it did so. See also Fluke v. State, 2000 OK CR 19, ¶ 6, 14 P.3d 565, 568; Le v. State, 1997 OK CR 55, ¶¶ 42-43. 947 P.2d 535, 552; Harjo v. State, 1994 OK CR 47, ¶¶ 73-74. 882 P.2d 1067, 1080. Consistent with this change, the jury in Petitioner's case was specifically instructed that the aggravator was applicable "where the death of the victim was preceded by torture of the victim or serious physical abuse" [O.R. (CF-99-01) 117]. See Maynard, 486 U.S. at 365 (acknowledging that limiting the heinous, atrocious, and cruel aggravator to cases involving some kind of torture or serious physical abuse would be constitutionally acceptable).

Moreover, since Oklahoma's imposition of a more narrow construction, the Tenth Circuit has repeatedly approved the aggravator, including the very instruction administered

in this case, and Petitioner has not presented any valid argument to overcome this abundant and controlling authority. Wilson, 536 F.3d at 1108; Workman v. Mullin, 342 F.3d 1100, 1115-16 (10th Cir. 2003); Hooks v. Ward, 184 F.3d 1206, 1239-40 (10th Cir. 1999). See also Miller v. Mullin, 354 F.3d 1288, 1300 (10th Cir. 2004) (acknowledging and listing cases in which the Tenth Circuit has upheld Oklahoma's heinous, atrocious, and cruel aggravator since Maynard); Medlock, 200 F.3d at 1321 ("We have held that the 'heinous, atrocious, or cruel' aggravating circumstance as narrowed by the Oklahoma courts after Maynard to require torture or serious physical abuse characterized by conscious suffering can provide a principled narrowing of the class of those eligible for death.").

Regarding Petitioner's additional complaint that the jury was not instructed regarding conscious physical suffering, the Tenth Circuit's decision in Wilson is decisive. In Wilson, the petitioner made the same argument raised here. The Court found the argument foreclosed by its prior decision in Workman, which upheld the very instruction given in this case. The Court additionally held, however, that "[e]ven if the jury instruction did not sufficiently narrow the jury's discretion, the state court can also perform this narrowing function on review." Wilson, 536 F.3d at 1108 (citing Walton v. Arizona, 497 U.S. 639, 654 (1990)).[28] In the present case, the OCCA specifically found that Mr. Pogue endured conscious physical suffering. Black, 2001 OK CR 5, ¶ 79, 21 P.3d at 1074. Thus, even if the instruction were deemed incomplete, the OCCA's finding satisfied the narrowing function.

_____

[28] The Tenth Circuit did not address the merits of this argument in light of Ring because it was inapplicable to Wilson's case. Ring is also inapplicable to Petitioner's case. See n.3, supra.

For the foregoing reasons, the Court finds that the OCCA's decision on Petitioner's Ground Twelve is not contrary to or an unreasonable application of Supreme Court law. Thus, relief is denied.

### 9. Ground Thirteen: Continuing Threat Aggravator.

In his Ground Thirteen, Petitioner challenges the constitutionality of Oklahoma's continuing threat aggravator. Citing Tuilaepa v. California, 512 U.S. 967 (1994), Petitioner asserts that this aggravator has too broad an application to pass constitutional muster. Petitioner raised this claim on direct appeal. The OCCA denied relief. Black, 2001 OK CR 5, ¶ ___, 21 P.3d at 1073.

In Tuilaepa, the Supreme Court acknowledged in order to satisfy the Eighth Amendment, an aggravating circumstance must meet two requirements: (1) it may not apply to every defendant convicted of murder; and (2) it may not be unconstitutionally vague. Tuilaepa, 512 U.S. at 972. While Petitioner acknowledges the Tenth Circuit's holding in Nguyen v. Reynolds, 131 F.3d 1340, 1352-54 (10th Cir. 1997), wherein the Court concluded that Oklahoma's continuing threat aggravator does not violate these Eighth Amendment requirements, Petitioner contends that it wrongly decided the issue of vagueness and did not address the overbreadth issue. Petition, p. 101.

Despite Petitioner's criticism of Nguyen, it is clear that its holding is a complete assessment of the constitutional question. In Nguyen, the Tenth Circuit specifically held, "[b]ecause the continuing threat factor is neither unconstitutionally vague *nor applicable to every defendant convicted of murder in the first degree*, it is properly used during both the

82

eligibility decision and the selection decision." Nguyen, 131 F.3d at 1354 (emphasis added). Thereafter, in Castro v. Ward, 138 F.3d 810, 816-17 (10th Cir. 1998), the Court specifically rejected Petitioner's argument, finding that while Nguyen focused primarily on the vagueness issue, it also addressed the over-breadth issue as well. Moreover, since Nguyen, the Court has not questioned its holding and determination of the issue, but has consistently held that Oklahoma's continuing threat aggravator is neither overbroad or vague. Wilson, 536 F.3d at 1109; Brown, 515 F.3d at 1092; Smith, 197 F.3d at 464; Hooks, 184 F.3d at 1238-39; LaFevers v. Gibson, 182 F.3d 705, 720 (10th Cir. 1999); Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999). In light of this authority, it is abundantly clear that the OCCA's decision in the present case upholding the constitutionality of its continuing threat aggravator is neither contrary to nor an unreasonable application of Supreme Court law. Petitioner's Ground Thirteen is therefore denied.

### 10. Ground Fifteen: Cumulative Error.

In his fifteenth and final ground for relief, Petitioner alleges that the cumulative effect of the errors alleged in his Grounds One through Fourteen entitle him to relief. The Court disagrees.

As recognized by the Tenth Circuit, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990). "A cumulative-error analysis merely aggregates all the errors that individually have been found

to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Id. at 1470. In capital cases, the focused inquiry is "whether the errors 'so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case.'" Wilson, 536 F.3d at 1122 (quoting Thornburg, 422 F.3d at 1137).

In his direct appeal to the OCCA, Petitioner argued his cumulative error claim. The OCCA denied relief. In particular, the OCCA held:

> We have thoroughly reviewed [Petitioner's] claims and the record in this case and they reveal no error which, singly or in combination, would justify either modification or reversal. Any irregularities or errors were harmless beyond a reasonable doubt.

Black, 2001 OK CR 5, ¶ 98, 21 P.3d at 1078. Petitioner unsuccessfully reasserted the claim in both his post-conviction applications. Black, No. PCD-2006-1059, slip op. at 2 n.2 & 3; Black, No. PC-2000-1073, slip op. at 5.

Of all the grounds raised by Petitioner, the Court has found error in only two. In his Ground Seven, the Court has found some of the comments made by the prosecutor in closing argument (both first and second stage) to be erroneous. See Section III.C.4., supra. In his Ground Ten, the Court has found that any consideration by the jury of extraneous information in the first stage to be harmless. See Section III.C.7., supra. For the same

reasons denying these errors individually, the Court finds that their cumulative consideration does not warrant relief. Accordingly, Petitioner's Ground Fifteen is denied.

## IV. Petitioner's Request for Discovery

Pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, Petitioner has filed a motion requesting leave to conduct discovery. Petitioner seeks to discover any information known to law enforcement about whether the victims possessed a gun on the night of the homicide and "any other exculpatory material." In particular, Petitioner seeks production of all files related to his case from the district attorney and Jefferson County Sheriff's Department, all documents relating to any gun found at the scene (whether in Mr. Pogue's Blazer or on either of the victims), and any other documents which might tend to impeach the witnesses who testified against him or exculpate him from his conviction and/or sentence. Doc. 15. Respondent has responded to the motion and asserted that it should be denied because Petitioner has failed to show good cause. Doc. 20. The Court agrees with Respondent that the motion should be denied.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Thus, Rule 6(a) provides that discovery may be permitted in a habeas proceeding only upon a showing of "good cause." As the Supreme Court acknowledged in Bracy, Rule 6 is meant to be consistent with Harris v. Nelson, 394 U.S. 286 (1969). Id. at 909. In Harris, the Supreme Court held that adequate inquiry should be permitted "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully

developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief . . . ." Harris, 394 U.S. at 300. See Wallace v. Ward, 191 F.3d 1235, 1245 (10th Cir. 1999) (citing Bracy); LaFevers, 182 F.3d at 723 (citing Harris and Bracy).

With regard to whether or not the victims possessed a gun on the night in question, Petitioner asserts only that such information "would [have] substantiate[d] the evidence they were reaching for something and would have further supported [his] defenses." Doc. 15 at 3. At trial, Petitioner's brother, Jimmy, did testify on cross-examination that while in pursuit of the victims, a conversation was had that the victims were "reaching for something." Jimmy denied, however, that such conversation ever included reference to a gun (Tr. III, 688-89). In his taped statement to police, Petitioner also mentioned the victims reaching and stated that he thought they might be going for guns. However, Petitioner also stated that he ultimately did not believe they had guns because the victims were not armed when they got out of the Blazer and no shots were fired. Later in this same statement, Petitioner stated that someone in the car kept saying that the victims had guns. Petitioner claimed that because of these statements, he was scared and "knew somebody was going to get hurt" (Tr. II, 519-20; Tr. III, 725; State's Exhibits 25 and 26, pp. 3 and 27).

Clearly, evidence that the victims may have been reaching for something immediately prior the altercation was before the jury. However, there is absolutely no support for an allegation that the victims possessed a gun. Of the seven people involved in the altercation that night, the jury heard evidence from four. The surviving victim, Mr. Lewis, and Petitioner's brother, Jimmy, both testified. In addition, Petitioner's statement and Robert

Seale's statement were both admitted into evidence. None of the four indicated that the victims had any weapons, much less a gun. In addition, Petitioner offers no support for how the issue is relevant in any event. Whether or not the victims may have had a gun in the Blazer or on their person, there is no evidence that any such weapon was ever displayed by the victims in any threatening manner prior to the altercation or used in the actual altercation itself in any manner. Petitioner admitted that he stabbed both victims numerous times and never claimed that his actions were influenced and/or in response to a gun or any other weapon possessed by them. Thus, Petitioner has failed to make any showing that possession of a gun was in any way relevant to his defenses.

As to Petitioner's additional request for "any other exculpatory evidence," the Court finds that the request is broad and general and lacks the specificity to support a finding of good cause. Petitioner has never alleged a violation of Brady v. Maryland, 373 U.S. 83 (1963), and he has presented no argument as to how this request is related to any other claim for relief. "A habeas proceeding is not a fishing expedition." Teti v. Bender, 507 F.3d 50, 60 (1st Cir. 2007). Where a request for discovery is "generalized and does not indicate exactly what information [a petitioner] seeks to obtain[,]" it does not meet the specificity requirements of Rule 6. Id. See also Hill v. Johnson, 210 F.3d 481, 487 (5th Cir. 2000) (noting that Rule 6 is not meant for fishing expeditions and that "factual allegations must be specific, as opposed to merely speculative or conclusory").

For the foregoing reasons, the Court finds that Petitioner has failed to demonstrate good cause in support of his request for discovery. Accordingly, the request is denied.

## V. Petitioner's Request for an Evidentiary Hearing

Petitioner has requested that the Court conduct an evidentiary hearing in this matter. In his Petition, Petitioner has requested a hearing on his Grounds Nine, Ten and Eleven and "as to any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the state." Petition, pp. 87, 92, 95, 104. By separate motion, Petitioner has renewed his request for an evidentiary hearing on these grounds, but additionally asserted that a hearing is warranted on his Grounds One, Two, Four, and Eight. Petitioner also requests a hearing "to show the inadequacies of Respondent's procedural defenses or that cause and prejudice overcomes them." Doc. 18. Respondent contends that Petitioner has not met the requirements for an evidentiary hearing on any matter. Response, pp. 83-85; Doc. 21.

In habeas corpus proceedings, evidentiary hearings are not granted as a matter of course. In fact, a petitioner's ability to obtain an evidentiary hearing on a particular claim is severely limited. In determining a petitioner's entitlement to a hearing, an initial inquiry must be made regarding his efforts to develop the claim in the state court. If a petitioner failed to develop the factual basis of the claim in state court, then the provisions of 28 U.S.C. § 2254(e)(2) apply. In accordance with this section, a petitioner must not only show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense," he must additionally demonstrate that the claim relies on either (A)(i) "a new rule of constitutional law, made retroactive to cases on collateral review by the

Supreme Court, that was previously unavailable" or (A)(ii) "a factual predicate that could not have been previously discovered through the exercise of due diligence." If, on the other hand, a petitioner was diligent in the presentation of his claim in state court proceedings, then he "is entitled to an evidentiary hearing in federal court 'so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief.'" Gonzales, 515 F.3d at 1121 (quoting Anderson v. Att'y Gen., 425 F.3d 853, 858 (10th Cir. 2005)). "However, a hearing is unnecessary if a claim can be resolved on the existing record." Id.

As an initial matter, the Court finds that Petitioner is not entitled to an evidentiary hearing to develop unapparent facts and/or facts disputed by Respondent. As the Tenth Court has acknowledged, in order to obtain a hearing on a habeas petition, "the factual allegations must be 'specific and particularized, not general or conclusory.'" Anderson, 425 F.3d at 858-59 (quoting Hatch v. Oklahoma, 58 F.3d 1447, 1471 (10th Cir. 1995)). Without reference to any particular fact or claim, the Court finds that this request is too vague and falls exceedingly short of showing a particularized need for an evidentiary hearing.

The Court also finds that an evidentiary hearing is unwarranted on Petitioner's procedurally barred claims. Petitioner's Grounds One, Two, Eleven and a portion of his Ground Four have all been procedurally barred by this Court. See Section III.B., supra. Consequently, the merits of these claims are not before the Court and a hearing on the propriety of the application of a procedural bar to these claims is unnecessary. As detailed herein, the procedural bar issue has been thoroughly briefed by the parties. Nothing more

is needed to determine these claims.  See McCleskey v. Zant, 499 U.S. 467, 494 (1991) ("The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard.").

While a portion of Petitioner's Ground Four has been procedurally barred, two of the trial counsel ineffectiveness claims set forth therein have been addressed on the merits and denied.  Petitioner did not seek an evidentiary hearing in state court on his first claim concerning trial counsel's presentation of his manslaughter theory.  He did, however, seek one with respect to his second claim regarding trial counsel's failure to discover and present important facts about Mr. Pogue and the crime scene.  See Section III.C.1., infra.  With respect to his Grounds Eight, Nine and Ten, Petitioner did not request an evidentiary hearing in state court on his Ground Eight, but did so with respect to his Grounds Nine and Ten.  See n.24, infra; Section III.C.6. & Section III.C.7., infra.

As the Supreme Court has acknowledged, "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."  Williams v. Taylor, 529 U.S. 420, 437 (2000).  See Fairchild v. Workman, 579 F.3d 1134, 1145 (10th Cir. 2009) ("To determine diligence, we look to a petitioner's efforts to develop facts in compliance with state law.").  Accordingly, the Court finds that Petitioner has failed to exercise diligence with respect to the manslaughter-related ineffectiveness claim in Ground Four and his Ground Eight.  Having failed to exercise diligence, Petitioner is only entitled to an evidentiary hearing on these claims upon

satisfaction of the prerequisites of § 2254(e)(2). In addition to the fact that Petitioner has made no attempt to satisfy § 2254(e)(2), the Court finds that this section cannot be met in any event. Petitioner is, therefore, not entitled to an evidentiary hearing on these claims.

With respect to the failure-to-discover ineffectiveness claim in Ground Four and his Grounds Nine and Ten, the Court finds that Petitioner did exercise diligence in seeking to develop these claims in the OCCA. Thus, Petitioner may obtain an evidentiary hearing on these claims if the "'allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief.'" Gonzales, 515 F.3d at 1121 (quoting Anderson, 425 F.3d at 858). After full consideration of these claims, the Court finds that Petitioner has not met this standard either. Like the OCCA, the Court has given due consideration to the additional evidence provided by Petitioner in support of these claims and determined that even with this additional evidence, Petitioner is not entitled to habeas relief. An evidentiary hearing is, therefore, unnecessary to the resolution of these issues.

For the foregoing reasons, the Court finds that Petitioner has failed to demonstrate the need for an evidentiary hearing in this matter. Accordingly, Petitioner's request is denied.

## VI. Conclusion

After a thorough review of the entire state court record, the pleadings filed herein and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition (Doc. 14), along with his motions for discovery (Doc. 15) and an evidentiary hearing (Doc. 18), are hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 10th day of February, 2010.


ROBIN J. CAUTHRON
United States District Judge